IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JESUS ZAMBRANO

    Plaintiff,

      vs.                       Case No.

PATRICK SCHUMACHER,
JOLIET POLICE DETECTIVE,
AND
CITY OF JOLIET

    Defendants.               JURY TRIAL DEMANDED

## **COMPLAINT**

NOW COMES the Plaintiff, JESUS ZAMBRANO, by and through his attorneys Stephen L. Richards and Joshua S.M. Richards and makes the following complaint against Defendants PATRICK SCHUMACHER, JOLIET POLICE DETECTIVE, AND CITY OF JOLIET

In support thereof, PATRICK SCHUMACHER states as follows:

## **JURISDICTION**

1. This action is brought pursuant to 42 U.S.C. Sec. 1983 to redress the deprivation of law of Jesus Zambrano's civil rights as secured by the United States Constitution.

2. This court has jurisdiction of the action pursuant to 28 U.S.C. Secs. 1331, 1343, 1367.

## VENUE

3. Venue is proper under 28 U.S.C. Sec. 1391(b).

## PARTIES

4. Plaintiff Jesus Zambrano is a male person who is a United States Citizen and a resident of Will County, Illinois.

5. Defendant Patrick Schumacher is and at all times relevant to this suit a detective in the Chicago Police Department. His star number is 20372. He is sued in his individual capacity.

6. Defendant City of Joliet is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

7. Defendant City of Cicero is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

## PROCEDURAL HISTORY

8. On May 28, 2009, Jesus Zambrano was arrested and charged with first degree murder.

9. Following a jury trial, he was convicted of first degree murder and sentenced sentenced to 45 years at 100 per cent time.

10. On July 29, 2016, the appellate court reversed his conviction, and remanded for a new trial. People v. Zambrano, 2016 Ill. App. 3d 140178, ¶ 33.

11. On August 27, 2019, a jury acquitted Jesus Zambrano of all charges.

## FACTS AT TRIAL

12. Plaintiff Jesus Zambrano was charged with two counts of first degree murder. Pedro Sanchez was also charged. The indictment alleged that on May 22, 2009, Zambrano and Sanchez shot Robert Gooch in the head with a handgun, intending to kill him (720 ILCS 5/9–1(a)(1) (West 2008)) (count I) or knowing that the act created a strong probability of death (720 ILCS 5/9–1(a)(2) (West 2008)) (count II).

13. Zambrano was arrested in Texas, about 25 miles from the Mexico border.

14. Zambrano was travelling with his mother and grandmother.

15. Zambrano had shaved his head, carried no identification and told the officer who stopped their vehicle that his name was Juan.

16. Zambrano was extradited to Illinois without objection.

17. The murder of Gooch took place at the Larkin Village apartment complex, which included buildings at 1007 and 1009 Lois Place.

18. The buildings could not be accessed through each other and had separate north and south entrance/exit doors.

19. Motion-activated cameras were mounted on each doorway.

20. Videos from the cameras on the south doors of 1007 and 1009 Lois Place were played in court.

21. State's exhibit 3, from 1009 Lois Place, showed an Oldsmobile Cutlass sedan pulling up and parking in front of the 1009 building at 12:47 a.m. on May 22, 2009.

22. A man got out of the front passenger seat and walked toward the building. He was wearing a white T-shirt and walked with his right hand at his side.

23. The driver, with dark hair and wearing a hoodie, then got out of the car.

24. As he walked to the front of the car, the backseat passenger on the driver's side reached into the front seat of the Cutlass.

25. The driver opened the hood, reached under it, and removed something, which he put into either his waistband or hoodie pouch.

26. The driver shut the car hood and walked toward the building.

27. A few seconds later, the driver's side, backseat passenger left the car and followed the driver toward the building.

28. The backseat passenger was also wearing a hoodie and pulled his hood over his head.

29. A fourth man stayed in the backseat on the passenger side.

30. The video showed the man in the white T-shirt walk toward 1007 Lois Place at 12:51 a.m.

31. Two seconds later, the driver and driver's side backseat passenger ran across the grass in front of the 1009 building.

32. The passenger was in front of the driver and got back into the Cutlass.

33. The driver again opened the hood and appeared to put something back under it.

34. Approximately 10 seconds later, the man in the white T-shirt is seen running from the left behind some other cars parked by the Cutlass.

35. The man in the white T-shirt and the driver both got back into the vehicle and left.

36. Elissa Hinton testified.

37. Hinton was Gooch's girlfriend.

38. Gooch and his two sons were spending the night at her apartment on the third floor at 1007 Lois Place when he was shot.

39. Someone buzzed her apartment after 11 p.m., when she and Gooch were sleeping.

40. Gooch eventually got up to answer the door.

41. Gooch opened the door and Hinton heard voices, which she identified as Gooch and Pedro Sanchez.

42. Hinton had recently broken up with Sanchez after dating him for three months while she was in a long-term relationship with Gooch.

43. Hinton heard Sanchez say, "It was my girl," and then heard a gunshot.

44. When she went into the living room, Hinton saw Gooch lifeless on the floor.

45. Hinton identified Sanchez from the video from the south door of 1009 Lois Place.

46. Sanchez was wearing a white T-shirt.

47. Hinton did not know Zambrano and did not identify him from the security camera videos.

48. A video from a McDonald's, State's Exhibit 4, was also played for the jury.

49. The video allegedly showed Zambrano, who was driving the Cutlass, pull through the drive through at 12:36 a.m. and leave at 12:40 a.m.

50. A Joliet police officer testified that the McDonald's is a 5 to 10 minute drive from the apartment complex.

51. An officer who responded to the scene testified that he was informed by another resident of the building that a man in a white shirt ran down the hallway on the third floor.

52. Christian Lopez was called to testify for the State.

53. Lopez's attorney informed the court that Lopez would invoke his fifth amendment rights if he took the stand.

54. Attorneys for Lopez and Zambrano argued that Lopez incriminated himself when he testified at Sanchez's trial and that he could still be indicted for Gooch's murder.

55. The State maintained that Lopez's mere presence at the murder location was not enough to sustain criminal charges.

56. The trial court disagreed with the State, finding that Lopez was more than an eyewitness; he went to the apartment complex with Zambrano and Sanchez, entered the building with them, and left with them.

57. The trial court granted Lopez the option of invoking his rights, reasoning he could be charged with a crime, and stating that Lopez had "a real fear and it's a real possibility, remote—if it's remote at all—but it exists."

58. In response, the State granted Lopez use immunity, and he testified.

59. Lopez stated that he was hanging out with Zambrano, Sanchez, Michael Ortiz, and another man on May 21, 2009.

60. They were at Latoya Ortiz's house drinking alcohol and smoking cannabis beginning at 2 p.m.

61. Around 4 p.m., Lopez got a ride to his girlfriend's house, where he stayed until 9 p.m.

62. Lopez and another friend then returned to Latoya's house, where Sanchez, Zambrano and Michael Ortiz were still partying.

63. The group continued drinking and smoking until sometime between 11:30 p.m. and midnight when Lopez, Sanchez, Zambrano, and Michael Ortiz went to McDonald's.

64. Zambrano drove Sanchez's gray Cutlass sedan.

65. Sanchez rode in the front seat, Lopez sat in the backseat behind the driver, and Ortiz sat behind Sanchez.

66. Lopez was intoxicated.

67. After they left the McDonald's drive through, they went to the Larkin Village apartment complex.

68. Zambrano parked in front and he and Sanchez exited the vehicle.

69. Zambrano told Lopez to get out of the car too.

70. Ortiz stayed in the backseat.

71. Zambrano opened the hood and Lopez assumed he grabbed something from under it.

72. Lopez exited the Cutlass and followed Zambrano and Sanchez toward the apartment building.

73. They were buzzed in, and as they entered the building, Zambrano tried to hand Lopez a gun, which he refused to take.

74. They walked up the stairs.

75. Lopez waited on the landing in the stairwell while Zambrano and Sanchez continued to the third floor.

76. Lopez heard a bang about five minutes later and fled, running back to the Cutlass.

77. Lopez identified the Cutlass pulling into the lot on the security camera video from 1009 Lois Place.

78. Lopez also identified himself, Sanchez and Zambrano getting out of the vehicle and running back to it several minutes later.

79. Lopez described Zambrano and Sanchez as "real amped up, real hyped."

80. Lopez went to Zambrano's house and spent the night.

81. According to Lopez, he was too scared to sleep and walked home first thing in the morning. He went voluntarily to the police station later in the day on May 22.

82. Lopez was impeached by defense counsel and admitted that he initially told the police that he was at Latoya's house, got drunk, woke up at home in bed, and did not remember how he got home.

83. Lopez did not mention Larkin Village or Zambrano, Sanchez, or Ortiz.

84. Lopez said he purposefully tried to make it sound like he was not involved in the shooting and that the other men were the perpetrators.

85. Lopez told the police that Zambrano grabbed something from under the hood but admitted that he did not see a gun until Zambrano tried to hand one to him in the apartment building.

86. Lopez described the object Zambrano grabbed from under the hood as "chrome-figured" and assumed it was a gun.

87. Lopez also told the police he was scared that Sanchez and Zambrano would kill him.

88. Lopez acknowledged that throughout his questioning by the police, he tried to make himself an "innocent bystander" and Zambrano and Sanchez "the bad guys."

89. Lopez was also examined regarding bias.

90. Lopez acknowledged he was on probation for an aggravated driving under the influence (DUI) conviction at the time of Gooch's murder.

91. Since that time, Lopez was charged with aggravated driving while license revoked (DWLR) in four cases, with possible six-year terms of imprisonment for each charge.

92. Three of the charges were dismissed after he testified in the Sanchez trial and the fourth was reduced to a misdemeanor.

93. At the time of Zambrano's trial, Lopez was charged with unlawful use of a weapon by a felon, with a possible sentence of 10 years in the Department of Corrections (DOC).

94. Lopez did not expect leniency for his pending charge. He was not charged in Gooch's murder and the State did not promise him anything in exchange for his testimony.

95. Defendant Patrick Schumacher authored a police report, told prosecutors, and testified at trial as follows.

96. Schumacher claimed that he went to Zambrano's house on May 22.

97. Schumacheer claimed that Zambrano, Sanchez, Ortiz, and Zambrano's mother, Norma, were all present.

98. Schumacher claimed Zambrano was questioned about the events of May 21 and that Zambrano said he was with Michael Ortiz and Pedro Sanchez, that they had left from his residence and went to the residence of a woman named Claudia, who lived off of Ruby Street near the west side of the Des Plaines River in Joliet. said that told the officer he was at a friend named Claudia's house with Sanchez and Ortiz. The officer did not ask about the early hours of May 22.

99. Schumacher's statements about what Zambrano said about his whereabouts were false.

100. A state trooper from Texas testified that he arrested Zambrano after noticing the vehicle Zambrano was riding in matched a BOLO (be on the lookout) alert.

101. The stop took place approximately 26 miles from the Texas/Mexico border. Zambrano, whose head was shaved, was with his mother and grandmother.

102. Zambrano did not have identification and said his name was "Juan."

103. Norma Zambrano testified on her son's behalf.

104. The Joliet police searched Norma Zambrano's home on May 22 with her consent.

105. Jesus Zambrano was home at the time, with his friends Sanchez and Lopez, whom she knew.

106. On May 27, the police returned with a warrant and told Norma Zambrano that Jesus Zambrano was charged with murder.

107. Jesus Zambano was not home.

108. Later that day, Norma Zambrano, her mother, and Zambrano left town at her direction.

109. Jesus Zambrano had no choice in the matter.

110. Norma Zambrano physically placed Jesus Zambrano in the car and told him to identify himself as "Juan" if asked.

111. Norma Zambrano admitted that Jesus Zambrano shaved his own head but said it was her suggestion.

112. The security camera video from 1007 Lois Place was played for the jury.

113. The camera showed Sanchez running south from the building and into the parking lot.

114. The time frame for the activity coordinated with the video from 1009 Lois Place, which showed Sanchez entering the frame on the 1009 Lois Place video.

115. A Joliet detective testified that Hinton identified Sanchez as the man in the white T-shirt in both videos.

116. The detective also said that it appeared Sanchez was holding something at his side in both videos.

117. Jesus Zambrano is innocent and did not murder Robert Gooch or participate in any way in his murder.

118. Jesus Zambrano did not make the statements attributed to him by defendant Patrick Schumacher.

## COUNT I – VIOLATION OF DUE PROCESS BY FABRICATION OF A FALSE STATEMENT ALLEGEDLY MADE BY JESUS ZAMBRANO

119. Jesus Zambrano realleges all previous paragraphs and incorporate them into this count by reference.

120. Defendant Schumacher authored a false police report, in which Schumacher claimed that Jesus Zambrano admitted he was in the company of acting in concert with Michael Ortiz and Pedro Sanchez, the actual killer.

121. Schumacher conveyed this information to the prosecutors and testified to these false statements at trial.

**122.** These statements were a material factor in Jesus Zambrano's wrongful conviction and deprived him of his fourteenth amendment right to due process.

### COUNT II – INDEMINIFICATION
### (DEFENDANT CITY OF JOLIET)

123. Patrick Schumacher realleges all previous paragraphs and incorporated them by reference.

124. Illinois law provides that public entities, such as defendant City of Joliet are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

125.	At all relevant time, defendant Schumacher was an agent of defendant City of Joliet acting within the scope of his employment. Defendant City of Joliet therefore, is liable as principal for all torts committed by its agent, defendant Schumacher.

PRAYER FOR RELIEF

WHEREFORE, Jesus Zambranorequests this honorable court to grant Jesus Zambranojudgment against all defendants in a fair and just amount. Specifically Jesus Zambranoprays for both compensatory and punitive damages against all defendants in addition to costs and reasonable attorney's fees and all other relief as this court finds just and reasonable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Jesus Zambranodemands trial by jury for all the issues pleaded.

Plaintiff, Jesus Zambrano

/s/ Stephen L. Richards

By: Stephen L. Richards
53 West Jackson Suite 756
Chicago, IL 60604
773-817-6927
Sricha5461@aol.com
Attorney No: 6191946