# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JESUS ZAMBRANO, | |
| Plaintiff, | |
| v. | Case No. 21-cv-4496 |
| CITY OF JOLIET and PATRICK SCHUMACHER | Honorable Steven Seeger |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants CITY OF JOLIET, a municipal corporation (hereafter the "City"), and PATRICK SCHUMACHER ("Defendant Schumacher") by and through their attorneys, submit the following Memorandum of Law in Support of their Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c):

### I. INTRODUCTION

This case arises from a criminal prosecution for the murder of Robert Gooch where Jesus Zambrano ("Plaintiff") was found guilty. Following Plaintiff's conviction, he appealed arguing ineffective assistance of counsel in that: (1) his counsel failed to impeach Christian Lopez with evidence that he received immunity to testify; and (2) failed to tender a jury instruction for accomplice liability. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 1. The Appellate Court reversed the conviction and remanded the case solely on the basis that his counsel's "failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony." *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 33. During Plaintiff's second criminal trial, he was found not guilty.

Now, Plaintiff brings this lawsuit arguing that Detective Patrick Schumacher created a false

police report and gave false testimony at trial regarding a conversation that the two of them had on May 22, 2009. Specifically, Defendant Schumacher's report states that on May 22, 2009, he had the following conversation with the Plaintiff:

> Zambrano stated to me that he was with his friends, PEDRO and MICHAEL. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother). Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River.

Interestingly, Plaintiff does not dispute the underlying factual information in Defendant Schumacher's police report, *i.e.*, that on May 21, 2009, he was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's house hours prior to the murder. The only thing Plaintiff disputes is that he never told Defendant Schumacher that he was with Michael Ortiz or Pedro Sanchez, and that he did not tell Schumacher the exact location of his whereabouts. Instead, according to Plaintiff, Defendant Schumacher must have obtained that information from someone else.

Plaintiff fails to present any genuine issue of material fact on his Fourteenth Amendment due process claim for fabrication of evidence. Plaintiff presents no evidence that Defendant Schumacher deliberately falsified evidence in bad faith, that the alleged false police report was used against him during either criminal trial or that the alleged false police report had a material impact on the prosecution or jury's guilty verdict. For the reasons stated herein, Defendant Schumacher and the City are entitled to judgment as a matter of law because the evidence in the record does not support Plaintiff's due process claim.

## II.  FACTS

Defendants herein incorporate their statement of facts as set forth in its Local Rule 56.1(a)(3) Statement of Undisputed Facts ("L.R. 56.1"), as offered in support of their motion for

summary judgment, but provide the following summary of undisputed facts for the Court's convenience.

On May 22, 2009, at around 1:00 a.m., the Joliet Police Department were notified that Robert Gooch was murdered at his girlfriend, Elissa Hinton's apartment located at Larkin Apartments, 1007 Louis Place, Apartment #309, Joliet, IL 60435. **SOF, ¶ 5.** The Joliet Police Department began an investigation, led by Detective Shawn Filipiak, where they quickly discovered their two prime suspects – Jesus Zambrano and Pedro Sanchez. **SOF, ¶ 6.** On May 22, 2009, at approximately 3:00 p.m., Defendant Schumacher, along with other officers, went to Plaintiff's residence, wherein Plaintiff, Pedro Sanchez and Michael Ortiz were there. **SOF, ¶¶ 8-9.** Defendant Schumacher had a conversation with the Plaintiff, and he communicated to Schumacher that in the afternoon hours of May 21, 2009, he was with his Pedro and Michael at Claudia's residence. **SOF, ¶ 10.** Critically, Defendant Schumacher did not ask Zambrano where he was at the time of the murder. **SOF, ¶ 11.**

The investigation continued, and the police obtained critical evidence regarding Plaintiff's involvement in the murder of Robert Gooch. Specifically, Defendant Schumacher and Detective Schott spoke with Christian Lopez who confirmed that Plaintiff was with Pedro and Michael at Claudia's residence. **SOF, ¶ 17.** Lopez stated that Plaintiff then drove them to McDonald's and after that, went to Larkin Apartments. **SOF, ¶ 18.** Lopez stated that he saw Plaintiff take what appeared to be a gun out of the hood of the car and go into the apartments to the third floor where the murder took place. **SOF, ¶ 19.** Lopez stated that the next thing he heard was a gunshot and saw Plaintiff run back to the car. **SOF, ¶¶ 19-20**

Following this conversation, the Joliet Police Department obtained video surveillance from the McDonald's and Larkin Apartments which corroborated Lopez's version of events. **SOF, ¶¶**

**54-55.** As a result, Detective Schott obtained an arrest warrant but once Plaintiff got wind of his arrest warrant, he shaved his head and fled to Mexico. **SOF, ¶¶ 21, 34.** Luckily, Texas State Trooper located Plaintiff, who did not have any identification but lied, and stated his name was "Juan." **SOF, ¶¶ 21, 33-34.**

### III. STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the court must view all facts and reasonable inferences in favor of the nonmoving party, those inferences must be both reasonable *and* find support in the record. *Samuelson v. LaPorte Cnty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008). The court is also not required to draw "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Summary judgment must be entered against the non-moving party where that party "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, at 322.

### IV. ARGUMENT

To state a fabrication of evidence claim, Plaintiff must establish that: (1) Defendant Schumacher deliberately falsified evidence in bad faith; and (2) the evidence was used at his criminal trial; and (3) the evidence was material; and (4) plaintiff was damaged as a result. *Brown v. City of Chicago,* 2022 WL 4602714, at *21 (N.D. Ill. 2022). Plaintiff's claim fails as a matter of law because: (1) Plaintiff cannot establish that Defendant Schumacher deliberately falsified his police report or statements; and (2) the police report was not used against Plaintiff at trial; and (3)

Defendant Schumacher's alleged false police report and statements did not have a material impact on the jury's guilty verdict.

A. ***Plaintiff Cannot Furnish Any Evidence That Defendant Schumacher Deliberately Falsified Evidence in Bad Faith. Rather the Evidence Properly Before the Court Establishes There Was No Deliberate Falsification in Bad Faith***

Summary Judgment is proper in this case as the Plaintiff fails to present any facts or evidence that Defendant Schumacher deliberately falsified his police report. Plaintiff must "offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Brown v. City of Chicago*, 2022 WL 4602714, at *21 (N.D. Ill. 2022); *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017). Here, at the time Defendant Schumacher authored his police report – May 23, 2009 @ 2:35 a.m. – there is no question that based on his investigation, he reasonably believed that Plaintiff was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's house hours before the murder. **SOF ¶¶ 23-24, 26.**

Defendant Schumacher's police report states:

On 05/22/09 at approximately 1500 hrs I had the following conversation with Jesus Zambrano **in essence and not verbatim**.

I advised Zambrano that he was not in custody and he was free to leave at any time at that point. I asked him if he would have a seat in the back of Sgt. Reid's unmarked squad car and he agreed to speak with me. At about that time, I reiterated to him again that he was not under arrest. Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. **Zambrano stated to me that he was with his friends, PEDRO and MICHAEL**. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother). **Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River**. Zambrano stated that he had several icehouse beers and had smoked some marijuana while at Claudia's house however he was not intoxicated. He stated that he and his friends had gone to Claudia's house and that they then returned to his house at 1025 N. Raynor. At about this time Sgt. Reid and I did bring Zambrano, voluntarily, to JPD in order to conduct a more in depth interview. Zambrano agreed to come to JPD

4

and speak with us. Again, Zambrano was advised that he was not under arrest and that he was free to leave at any time at that point.

**Ex. B.**

Shortly after this conversation at approximately 4:45 p.m., Defendant Schumacher's investigation further confirmed Plaintiff's statements when he arrived at Claudia Sanchez's residence. **SOF ¶ 15.** Defendant Schumacher spoke with two witnesses, Claudia Sanchez and Latoya Ortiz, who both confirmed that Plaintiff was with Michael Ortiz and Pedro Sanchez at her residence at the time in question. **SOF ¶¶ 15-16.** Even more, Claudia Sanchez and Latoya Ortiz positively identified Jesus Zambrano, Michael Ortiz and Pedro Sanchez as the individuals who were at her residence at the time in question through a photo lineup. **SOF ¶¶ 15-16.**

Later that day on May 22, 2009, at 10:10 p.m., Defendant Schumacher and Detective Schott interviewed Christian Lopez who confirmed that he was with the Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence where they were drinking and smoking marijuana. **SOF ¶ 17.** Lopez stated that after Claudia Sanchez's residence, Plaintiff drove him, Pedro Sanchez and Michael Ortiz to McDonald's and then to Larkin Apartments. **SOF ¶ 18.** While at Larkin Apartments, Lopez stated that he observed Plaintiff retrieve a gun from the hood of the car where he, along with Lopez and Sanchez proceeded to go into the apartment complex. **SOF ¶ 19.** Lopez stated that Plaintiff and Sanchez went up the stairs to the third floor of the apartment complex, but he stayed at the bottom of the stairs. Lopez stated that the next thing he heard was a gunshot and saw Plaintiff and Sanchez run downstairs to the car. **SOF ¶ 19.** Lopez then stated that Plaintiff put the gun back into the hood of the vehicle and drove everyone back to Plaintiff's house where they spent the night. **SOF ¶ 20.** All of the above information was known to Defendant Schumacher at the time he authored his police report on May 23, 2009 at 2:25 a.m.

At issue here is Defendant Schumacher's conversation with the Plaintiff when he went to his residence on May 22, 2009. When Defendant Schumacher arrived, Plaintiff, Pedro Sanchez and Michael Ortiz were there. **SOF ¶ 9.** Zambrano indicated that he was with Pedro Sanchez and Michael Ortiz at a girl's house. **Ex. B**. Defendant Schumacher recalls that Plaintiff gestured to Defendant Schumacher that he was with "these guys." **Ex. B, ¶ 25.** Defendant Schumacher's subsequent investigation 100% confirmed that this information was true – that Plaintiff was with Pedro Sanchez and Michael Ortiz at Claudia's House. **SOF ¶ 26.** Plaintiff admits that he told Defendant Schumacher on May 22, 2009, "[i] told him I was with my girl and a couple friends the night before, and that was it." **Ex. A**, 113: 8-9.

Based on what Defendant Schumacher knew at the time he authored his police report, it is a perfectly reasonable inference that when Plaintiff said he was with "my girl and a couple of friends the night before" he was referring to Claudia Sanchez, Michael Ortiz and Pedro Sanchez. Plaintiff's blanket assertion that he did not specifically tell Defendant Schumacher he was with "Michael" or "Pedro" fails to establish sufficient evidence that Defendant Schumacher knew the information in his police report was false. In fact, in a pre-trial motion, Plaintiff's own counsel – Cosmo Tedone - admitted during a court proceeding that Plaintiff made a brief statement to Defendant Schumacher where he indicated that "he was with his friends, Pedro and Michael. Zambrano then stated that they had gone to a girls house names Claudia who lived somewhere around Ruby Street on the west side of the Des Plaines River." **SOF ¶ 42.** As such, summary judgment should be entered in his favor.

Notwithstanding Plaintiff's failure to furnish any evidence that Defendant Schumacher deliberately falsified his report, there is a difference between fabricated evidence, which is necessarily untrue, and evidence obtained through coercion, which may be true. *See Coleman v.*

*City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019). The Seventh Circuit has held that "coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but ... unlike falsified evidence and perjured testimony, [coerced testimony] may turn out to be true." *Petty v. City of Chicago*, 754 F.3d 416, 422–23 (7th Cir. 2014).

Here, even if Defendant Schumacher incorrectly attributed certain information in his report to Plaintiff, which Defendants deny, the underlying factual information in his police report turned out to be true. Plaintiff admits that he spoke with Detective Schumacher on May 22, 2009, at approximately 3:00 p.m. outside his residence. **SOF ¶ 37.** Plaintiff admits that on May 21, 2009, he was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. **SOF ¶ 38.** Plaintiff admits that he was drinking beer and smoking marijuana while at Claudia's residence. **SOF ¶ 39.** Given that the underlying information is true, Defendant Schumacher cannot be said to have fabricated evidence and therefore his due process claim fails. *See Petty,* 754 F.3d 422–23.

> **B.** *Plaintiff's Fabrication of Evidence Claim Fails Because Defendant Schumacher's Police Report Was Not Used Against Him at Trial*

Plaintiff's fabrication of evidence claim likewise fails because Defendant Schumacher's police report was not used against him at either criminal trial. In this regard, Chief Judge Pallmeyer's recent opinion in *Brown v. City of Chicago* is directly on point. There, plaintiff alleged that three detectives created false police reports who then testified consistent with those false reports at trial. *Brown v. City of Chicago*, No. 2022 WL 4602714, at *23 (N.D. Ill. 2022). Plaintiff argued that even though the police reports were not admitted into evidence, the reports still deprived him of his liberty because the officers testified consistent with those reports, which the jury used to convict him. *Id.* The Court rejected that argument stating that the false police reports

7

were not used against him during his trials. *Id.* There, neither report was introduced at his trials, and neither report was used to refresh a witness's recollection during either trial. *Id.* The Court held that plaintiff's fabrication of evidence claims failed because he did not establish that the alleged false police reports were used against him at trial. To support this holding, the Court relied on the Seventh Circuit's decision in *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) that found the jury instructions on a fabrication of evidence claim were insufficient because they did not "explain that plaintiff had the burden to prove the fabricated evidence was used against him at his criminal trial." *Id.* at *21.

Like *Brown,* Defendant Schumacher's police report did not see the light of day in his criminal trials. Defendant Schumacher's police report was not admitted into evidence, nor did the prosecution use said report in any way during Plaintiff's criminal trial. **SOF, ¶ 52.** Like *Brown,* Defendant Schumacher did testify consistent with the police report but that is insufficient to establish that the police report itself was used during his criminal trial. **SOF, ¶¶ 50, 72.** Since Plaintiff fails to establish any evidence that Defendant Schumacher's police report was used during his criminal trial, Defendant Schumacher is entitled to summary judgment. *See Moran v. Calumet City,* 54 F.4th 483, 499 (7th Cir. 2022) (individual failed to state a fabrication of evidence claim because the allege false police report was not introduced at trial).

C. ***Defendant Schumacher's Police Report Did Not Have a Material Impact on His Guilty Verdict***

Even if the Court finds that Defendant Schumacher deliberately falsified evidence, which Defendants deny is possible, the alleged false evidence did not have a material impact on the jury's guilty verdict, and therefore, Plaintiff's fabrication of evidence claim fails. To prevail on a fabrication of evidence claim, the fabricated evidence must be "material" meaning "there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick,* 974 F.3d at 835

(7th Cir. 2020). "The mere possibility that an item of evidence may have helped a defendant during his trial on criminal charges does not establish materiality." *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011).

As stated above, Defendant Schumacher's alleged false police report was not admitted or used in any way during either criminal trial. **SOF, ¶ 52.** Moreover, Defendant Schumacher's alleged false police report did not provide the Will County State's Attorney's Office with probable cause to obtain Jesus Zambrano's arrest warrant for the murder of Robert Gooch because his police report fails to put Zambrano at the scene of the murder. **SOF, ¶ 30.** In fact, Defendant Schumacher did not even testify during Zambrano's grand jury proceedings. **SOF, ¶ 29.** As this Court noted in its August 11, 2022 motion to dismiss ruling, Defendant Schumacher's alleged false police report did not "get the ball rolling" towards prosecution because it does not even support probable cause for Plaintiff's arrest on the charge of murder. *See Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014) (affirming dismissal of fabrication of evidence claim where police officers alleged false statements did not establish probable cause because of strength of remaining evidence). Plaintiff's speculation that Defendant Schumacher's police report had an impact on his prosecution is not sufficient to establish a genuine issue of material fact. *See Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir.1999) (a party must present more than mere speculation or conjecture to defeat a summary judgment motion). As such, summary judgment is appropriate.

In *Holland v. City of Chicago,* 643 F.3d 248, 250 (7th Cir. 2011) the court discussed the materiality of withheld evidence on a jury conviction. There, plaintiff was arrested and charged with sexually assaulting a female. Immediately after the assault, the female gave the city officers a description of the assailant as a man who wore jeans with "cartoons" on them and dropped a knife in a nearby alley. *Id.* at 251. The city officers located the alley and found the plaintiff near a

9

trashcan holding a pair of jeans with cartoons on them. *Id.* The city officers then showed a picture of plaintiff to the female and asked her if this was her attacker. *Id.* Initially, the female told the officers at least three times "no" that was not her attacker. *Id.* Thereafter, a female officer told the female that she was in good hands and that the "rapist couldn't hurt her anymore." *Id.* at 252. Then the female finally identified plaintiff as her attacker. *Id.* Plaintiff was tried and convicted based on the female's identification that included the "cartoon" pants description. *Id.* Plaintiff's conviction was later overturned when DNA evidence established that it was plaintiff's uncle who sexually assaulted the female. *Id.* at 250. Plaintiff filed a lawsuit alleging in part that the female officer "urged, coaxed, or pressured" the female into identifying plaintiff as her attacker. *Id.* The sole question before the court was whether the alleged officer's conduct, if true, had a material impact on the plaintiff's jury conviction. *Id.* The Court held that the alleged officer's conduct did not because of the following other strong pieces of physical evidence: (1) unique "cartoon" jeans; and (2) Plaintiff's proximity to the assault in a nearby alley – that resolved any doubt of Plaintiff's guilt. *Id.* at 256. Thus, even if the female officer coerced the statement, it did not have a material impact because of the strong pieces of physical evidence. *See Beaman v. Freesmeyer,* 776 F.3d 500 (7th Cir. 2015) (polygraph report was not material in light of a strong alibi defense)*; Smith v. Almada,* 640 F.3d 931, 939 (9th Cir. 2011) (police officer's omission of suspect descriptions would not have created "a reasonable probability of a different result" and hence was not material).

Not only did Defendant Schumacher's alleged false statements not have any impact on the decision to prosecute Plaintiff, like *Holland,* it also was not material to the jury's guilty verdict. First, the prosecution called Defendant Schumacher as a witness because of his involvement with performing the GSR test. **SOF, ¶ 48.** A GSR test detects the presence of distinctive chemicals that are deposited on a person's skin or clothing when a gun is fired. *Id.* During the trial, Defendant

10

Schumacher testified that he attempted to perform a GSR test on Jesus Zambrano and Christian Lopez. **SOF, ¶ 49.** However, instead of using a GSR kit, Schumacher used a fingernail swabbing kit. *Id.* As a result, Schumacher did not obtain a sample from either Zambrano or Lopez because he used the wrong testing kit. *Id.* Defendant Schumacher's testimony related to the GSR test helped refute Zambrano's counsel's argument that the Joliet Police Department did not perform a GSR test. As a result, Defendant Schumacher's statements as to his conversation with Plaintiff were background information that was not intended, nor used to influence the jury's guilty verdict.

Moreover, like *Holland,* Defendant Schumacher's alleged false police report did not have a material impact on Plaintiff's jury conviction because there were numerous other pieces of material evidence that put Plaintiff closer in time to the murder than Detective Schumacher's testimony. For example, the People admitted into evidence the surveillance video from the McDonald's drive through which clearly depicted Plaintiff as the driver of the gray cutlass vehicle at approximately 12:40 a.m., which was just fifteen minutes before the murder. **SOF, ¶ 54.** Additionally, the People admitted into evidence the video surveillance from Larkin Apartments where the murder took place. **SOF, ¶ 55.** This video showed the same gray cutlass vehicle arriving and leaving the scene of the murder. Importantly, the time stamps of these videos established that the gray cutlass arrived at 12:47 a.m. and left Larkin apartments at 12:54 a.m., which was during the time of the murder. *Id.*

The Larkin Apartments surveillance video was a critical piece of evidence because it depicted the driver of the gray cutlass, who was wearing the same clothes as Plaintiff in the McDonald's video, open the hood of the gray cutlass and take what appeared to be a gun out of the vehicle and place it in his waistband. **SOF, ¶ 56.** This video further depicts the driver of the gray cutlass entering Larkin Apartments with the alleged handgun where the murder took place.

*Id.* The video further depicts the driver of the gray cutlass running out of Larkin Apartments, leaving the murder scene, and placing the alleged handgun back into the hood of said vehicle. *Id.* The People called Joliet Police Department Computer Forensic Examiner, Christopher Botzum who testified using scientific analysis that the gray cutlass in the McDonald's surveillance video was the same gray cutlass in the Larkin Apartment surveillance video. **SOF, ¶ 59.**

Arguably the most important factor in Plaintiff's conviction was the testimony of Christian Lopez. **SOF, ¶ 57.** Lopez was the only eyewitness that corroborated the video evidence that confirmed Plaintiff was the driver of the gray cutlass and that he was the one who murdered Robert Gooch. *Id.* First, Lopez confirmed Defendant Schumacher's testimony that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana. **SOF, ¶ 17.** Detective Schott also testified during Plaintiff's criminal trial that during his conversation with Lopez, Lopez confirmed that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana. **SOF, ¶ 58.** Lopez further testified that after Claudia Sanchez's residence, Plaintiff drove him, Pedro Sanchez and Michael Ortiz to McDonald's and then went to Larkin Apartments. **SOF, ¶ 18.** While at Larkin Apartments, Lopez testified that he observed Plaintiff retrieve a gun from the hood of the car where he, along with Lopez and Sanchez proceeded to go into the apartment complex. **SOF, ¶ 19.** Lopez testified that Plaintiff and Sanchez went up the stairs to the third floor of the apartment complex, but he stayed at the bottom of the stairs. *Id* Lopez testified that the next thing he heard was a gunshot and saw Plaintiff and Sanchez run downstairs to the car. *Id.* Lopez then stated that Zambrano put the gun back into the hood of the vehicle and drove everyone back to Plaintiff's house where they spent the night. *Id.* Without Lopez's testimony, the police did not have probable

12

cause for an arrest warrant, and ultimately the prosecution could not have obtained a guilty verdict against Plaintiff for the murder of Robert Gooch. **Ex C, ¶ 23, SOF, ¶ 18.**

Another critical piece of evidence was the testimony of Texas State Trooper Jon Lantz because he confirmed the People's theme of the case, which was that guilty people, like Plaintiff, flee and alter their appearance/identity. **SOF, ¶ 60.** On May 26, 2009, Joliet Police Officers went to Plaintiff's home to arrest him, but he was not there. **SOF, ¶ 31.** Instead, the officers spoke with Norma Zambrano – Plaintiff's mom - who assured the officers that Plaintiff would turn himself in. *Id.* Instead, on or around May 27, 2009, the Joliet Police Department were notified that Plaintiff, Norma Zambrano and his grandma fled the residence in a red vehicle. **SOF, ¶ 32.** As a result, the Joliet Police Department entered the red vehicle into a data base that allowed all officers within the United States to be on the lookout ("BOLO") for said vehicle. *Id.* Trooper Lantz testified that on May 28, 2009, he saw the car matching the vehicle in question and pulled it over. In the car were two females and one male occupant. **SOF, ¶ 33.** The male occupant shaved his head and did not have any identification. **SOF, ¶ 34.** Trooper Lantz requested the male occupants name, who then stated that his name was "Juan." *Id.* Trooper Lantz testified that this male occupant was none other than the Plaintiff. **SOF, ¶ 35.** Trooper Lantz testimony was also supported with his police car video surveillance. **SOF, ¶ 47.**

Additional evidence supports the fact that Defendant Schumacher's testimony was not material to the jury's verdict. ASA Walsh and Plaintiff's counsel – Charles Bretz – did not rely on Defendant Schumacher's testimony during opening or closing arguments. **SOF, ¶ 61.** During jury deliberations, the jury never requested any additional information regarding Defendant Schumacher's testimony and instead requested the following pieces of material evidence:

- McDonald's surveillance video
- Larkin Apartments surveillance videos

- Result of the Sanchez trial
- All photographs

**Ex. F, ¶ 63.** Moreover, during a post-trial motion, Plaintiff's counsel argued for a new trial stating that:

> "[w]hat they did is to go through this frame by frame and back and forth and what the gentleman told me is they saw shadows and things that they were not able to see in Court and **that was a primary factor in making their decision**." (Plaintiff's counsel was referring to the Larkin Apartments surveillance video). **SOF, ¶ 65.**

The "gentleman" Mr. Bretz referred to was a jury member during Zambrano criminal trial who he allegedly spoke with following the trial. *Id.*

Furthermore, the Illinois Appellate Court's decision to reverse and remand Plaintiff's conviction further supports that Defendant Schumacher's alleged false police report was not material to Plaintiff's jury conviction. There, Plaintiff appealed his guilty verdict arguing that: (1) his counsel failed to impeach Lopez with evidence that he received immunity to testify; and (2) failed to tender a jury instruction for accomplice liability. **SOF ¶ 66.** Importantly, Plaintiff did not argue on appeal that Detective Schumacher gave false testimony and/or created a false police report that was material to the jury's improper guilty verdict. **SOF ¶ 67.** The Appellate Court reversed and remanded Plaintiff's conviction because of his counsel's "failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony." **SOF ¶ 68.** Thus, the Appellate Court's ruling had nothing to do with Defendant Schumacher's alleged false police report.

Finally, when both criminal trials are compared, it provides further evidence that Defendant Schumacher's supposed false police report and testimony did not have a material impact on either verdict. This is so because Defendant Schumacher's testimony at both criminal trials remained the same. **SOF ¶¶ 50, 72.** Additionally, the witnesses and exhibits remained virtually the same.[1] **SOF**

---

[1] In Plaintiff's second criminal trial, his counsel effectively introduced a new Exhibit, Plaintiff's Hufford Junior High Yearbook into evidence to rebut Lopez's testimony that he barely knew Plaintiff and was not that close with him.

¶¶ **45-47, 71-75.** The main difference between the criminal trials was a result of the Illinois Appellate Court's decision that allowed Plaintiff to introduce an accomplice liability jury instruction and impeach the People's star witness, Christian Lopez based on his immunity to testify. Simply put, Plaintiff's counsel got a second bite at the apple and did a much better job of destroying the credibility of Lopez who was the only eyewitness to the murder. *Compare* Lopez testimony in first trial, **Ex. E.** pgs. 275-347 to the second trial **Ex. F**, pgs. 203-264. Given the above numerous pieces of material evidence, Plaintiff fails to establish any reasonable likelihood that had Defendant Schumacher not testified about his conversation with Plaintiff on May 22, 2009, the result of his first criminal trial conviction would have been different.

### D. *City of Joliet Indemnification*

Count II alleges indemnification against the City, which is not an independent cause of action, but a request for relief from the City, should Defendant Schumacher be found liable for Plaintiff's fabrication of evidence claim. Because Defendant Schumacher is not liable for Plaintiff's fabrication of evidence, the indemnification issue is a moot point.

### VI. CONCLUSION

Defendants City of Joliet and Patrick Schumacher are entitled to judgment as a matter of law because Plaintiff fails to establish a genuine issue of material fact on his fabrication of evidence claim because: (1) Defendant Schumacher did not deliberately falsify evidence in bad faith; (2) Defendant Schumacher's police report was not used against Plaintiff during either criminal trial; and (3) Defendant Schumacher's police report did not have a material impact on the prosecution of Plaintiff for the murder of Robert Gooch or the jury's guilty verdict.

WHEREFORE, Defendants City of Joliet and Patrick Schumacher respectfully request that this Court grant their motion for summary judgment pursuant to Fed. R. Civ. P. 56(c) and for all other further and appropriate relief.

Dated: June 9, 2023

                                              Respectfully submitted,

                                              */s/ John O'Driscoll*

John O'Driscoll
Darcy Proctor
Andrew O'Donnell
TRESSLER LLP
550 E Boughton Rd #250
Bolingbrook, IL 60440
312-627-4000
jodriscoll@tresslerllp.com
dproctor@tresslerllp.com
dodonnell@tresslerllp.com

Attorneys for City of Joliet and Patrick Schumacher

# CERTIFICATE OF SERVICE

I hereby certify that on, I electronically filed the foregoing paper with the Clerk of the Court using the ECF System which will send notification to all counsel of record via the Court's CM/ECF system on June 9, 2023.

/s/Andrew O'Donnell
Andrew O'Donnell

Attorney for City of Joliet and Patrick Schumacher