IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JESUS ZAMBRANO,

Plaintiff

v.                                                                            Case No. 21-cv-4496

CITY OF JOLIET and PATRICK                    Hon. Steven Seeger, Judge Presiding
SCHUMACHER,

Defendants

# PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(b) (3) and in opposition to the motion for summary judgment brought by defendants City of Joliet and Patrick Schumacher, plaintiff Jesus Zambrano by and through Stephen L. Richards presents the following Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

To the extent that Jesus Zambrano has admitted defendants' statements of fact, these facts are incorporated by reference. The following additional facts are pertinent.

Defendant Schumacher testified that once a police report is generated, part of defendant Schumaker's job was to go to court and to testify. (PAF, ¶ 2). After a report is generated, it, the original copy is kept in the Records Department of the Joliet Police Department. . (PAF, ¶ 3). A working copy of the report would have been kept with the lead detective in the case, in this instance, Shawn Filipiak. Defendant Schumacher had no reason to believe that Shawn Filipiak did not have a copy of Schumacher's report. (PAF, ¶ 4).

Defendant Schumacher could not recall whether he kept a copy of his report. (PAF, ¶ 5 ). But defendant Schumacher had no reason to believe that the States Attorney who put him on to testify did not have a copy of Schumacher's report. . (PAF, ¶ 6).

1

Defendant Schumacher admitted that generally it is his practice to meet or speak with a States Attorney before he testifies. (PAF, ¶7). Defendant Schumacher could not "say for sure" whether or not he met with a States Attorney every time he testified at trial. He had testified at trial 50 to 100 times. (PAF, ¶ 8). Defendant Schumacher had no independent recollection of meeting with an Assistant States Attorney before he testified in the Robert Gooch murder case or whether the States Attorney he met with had a copy of his police report. (PAF, ¶ 9).

According to Daniel M. Walsh, the lead prosecutor at Jesus Zambrano's first trial, it is part of his procedure to receive police reports n the cases that he tries. . (PAF, ¶ 10). A secretary in the States Attorney's Office would order police reports from the police department and then the file would be given to whoever was assigned to the case. (PAF, ¶ 11).

To prepare police officers to testify, Walsh would typically meet with police officers at his office ahead of time or he would talk with them on the phone. . (PAF, ¶ 12). Walsh could not recall any murder case in which he put a police officer on the stand without speaking with him first. . (PAF, ¶ 13). Walsh conceded that it would be poor idea to put a police officer on the stand without speaking with him first. (PAF, ¶ 14). Walsh generally relied upon the accuracy of police reports when putting officers on the stand to testify. (PAF, ¶ 15).

Although Walsh had no specific memory of speaking with Patrick Schumacher before he testified, he had no reason to believe that he did not interview Schumacher on the stand before Schumacher testified. (PAF, ¶ 18).

Walsh reviewed Patrick Schumacher's report in the Robert Gooch murder case and although he did not specifically remember reviewing the report before Schumacher testified he was virtually certain that he would have reviewed that report. (PAF, ¶ 19). Walsh was virtually certain that this was the report he would have reviewed before he put Patrick Schumacher on the stand. (PAF, ¶ 20). To the best of Walsh's belief, the information that Patrick Schumacher put in his report and

whatever Walsh told him before he testified is the information he used and was guided in in terms of presenting Schumacher's testimony. (PAF, ¶ 21).

On May 22, 2009, at about 3:00 p.m., Defendant Schumacher talked to Jesus Zambrano in the front driveway area of his house at 1025 north Raynor. (PAF, ¶ 22). The interaction between Schumacher and Jesus Zambrano consisted of the exchange of a couple of sentences. (PAF, ¶ 23). The interaction was more of an interrogation than a conversation. (PAF, ¶ 24).

Patrick Schumacher's statements in his police report that he asked Jesus Zambrano to get into the back seat of Sergeant Reed's unmarked squad car and told Jesus Zambrano that he was not under arrest was false. It was also false that Jesus Zambrano agreed to speak with Patrick Schumacher. In fact Schumacher asked Sergeant Reed what to do with Zambrano and Sergeant Reed told Schumacher to put Zambrano in the backseat. Schumacher said to Zambrano to "jump in" and Zambrano jumped in. Schumacher did not tell Zambrano that he was not under arrest and Zambrano did not agree to speak with Schumacher. (PAF, ¶ 25).

Patrick Schumacher's statement in his police report that Jesus Zambrano told Schumacher that he was with Pedro Sanchez and Michael Ortiz the night before May 22, 2009 was false. In fact, Zambrano said only that he was at a female's house and had gone home. (PAF, ¶ 26).

Patrick Schumacher's statement in his police report that Jesus Zambrano told Schumacher that the night before Jesus Zambrano went to Claudio Sanches's house in the area of Ruby Street near the west side of the Des Plaines river was false. Jesus Zambrano never gave Schumacher that information. (PAF, ¶ 27). On May 22, Patrick Schumacher asked Jesus Zambrano where he was the might before. (PAF, ¶ 28).

Patrick Schumacher was called as a witness by the defense in Jesus Zambrano's second trial. He testified that although he initially had testified on cross-examination that Michael Ortiz was not arrested as part of his investigation, he had reviewed his police report over the weekend, his

3

recollection had been refreshed, and he now remembered that Michael Ortiz had been arrested.

(PAF ¶ 29).

In her opening closing argument in Jesus Zambrano's first trial, prosecutor McKenna referred to Patrick Schumacher's testimony as follows:

"That afternoon, the day of May 22, 2009, Detective Schumacher goes to talk to the defendant. When he gets there, the defendant is still with Pedro Sanchez; but Detective Schumacher gets him away and talks to him alone. And the defendants doesn't say that Pedro Sanchez did anything or anything along those lines.
Mr. Bretz: Objection, Judge.
The Court: I will sustain the objection.
Mr. Bretz: I ask the jury to disregard.
Ms. McKenna: The defendant said that he was with Pedro the night before."

(PAF, ¶ 30).

In his closing argument, in Jesus Zambrano's first trial, defense counsel Bretz referred to Jesus Zambrano's conversation with Patrick Schumacher as follows:

"The third distinction between Jesus and Lopez is we know how Lopez lied and tried to direct attention away from himself. As to Jesus, there was no evidence presented other than he was questioned about the evening of May 21, and I specifically asked the detective if he talked to him about being at Lois Place during the early morning hours of May 22, 2009, and he said, no, which leads us to the fourth and final distinction between then."

(PAF, ¶ 31).

In his rebuttal closing argument in Jesus Zambrano's first trial, prosecutor Walsh referred to Patrick Schumacher's testimony as follows:

Mr. Bretz talks a lot about Christian Lopez and his credibility as a witness. Well, think about this. The next day Jesus Zambrano talked to the police and doesn't tell them about the previous night.
Mr. Bretz: Objection, your Honor.
The Court: Sustain the objection.
Mr. Walsh: Jesus Zambrano talks to the police, mentions that he was with his friends and nothing else."

(PAF, ¶ 32)..

4

During Jesus Zambrano's first trial, his mother, Norma Zambrano testified that on May 27, 2009 police came to her home and informed her that there was a murder warrant out for Jesus Zambrano. After she heard about the warrant, she left Joliet with her son, Jesus Zambrano. It was her idea to leave, and she did not give her son any choice in the matter. She told him to cut his hair and say that his name was Juan. She physically put him int the car. She did not testify that she told Jesus Zambrano about the warrant. (PAF, ¶ 33)..

During Jesus Zambrano's first trial, Christian Lopez was extensively cross-examined and impeached with his prior lies to the police,, his prior inconsistent statements, his poor memory for events, his consumption of marijuana and alcohol, his prior felony convictions, and his pending cases, and his favorable treatment by the prosecution. (PAF, ¶ 33)..

During Jesus Zambrano's first trial Elissa Hinton testified that she heard Pedro Sanchez's voice just before Robert Gooch was shot. Sanchez was a former boyfriend, had argued with Robert Gooch and had a motive to murder Robert Gooch, her current boyfriend. She did not know Jesus Zambrano and had no knowledge of any animosity between Jesus Zambrano and Robert Gooch. (PAF, ¶ 34).

## ARGUMENT

Defendants maintain that summary judgment should be granted because (1) there is no evidence that Defendant Schumacher acted in "bad faith" when he wrote in his report and conveyed to prosecutors that Jesus Zambrano admitted being with witnesses and codefendants at or near the time of the murder, (2) there is no evidence that Defendant Schumacher's fabricated police report was used against Jesus Zambrano at trial, and (3) Schumacher's fabrication did not have a material impact upon Jesus Zambrano's trial. All three claims should be rejected.

Summary judgment is proper only when there is no genuine dispute of material act, and the

5

moving party is entitled to judgment as a matter of law. *Weaver v. Champion Petfoods USA Inc*., 3 F.4th 927, 934 (7th Cir. 2021). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dunn v. Menard, Inc*., 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248 (1986)). A dispute of fact is material if the fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

On summary judgment, all statements of fact and inferences therefrom are to be considered in the light most favorable to the non-moving party. *Wolf v. Buss America Inc*., 77 F.3d 914, 918 (7th Cir. 1996). Credibility of witnesses can only be assessed at trial. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Where a determination of the credibility of witnesses is essential to resolving an issue of material fact, summary judgment is properly denied. *Spreen v. Brey*, 961 F. 2d 109, 111 (7th Cir. 1992).

> "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' *Liberty Lobby*, supra, at 255. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150-151 (U.S. 2000).

Jesus Zambrano and the defendants are in agreement as to the material elements of a Sec. 1983 fabrication claim. The Fourteenth Amendment's Due Process Clause prohibits law enforcement officers from depriving a defendant of a fair trial by knowingly using false evidence, including false testimony, to obtain a conviction. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *Coleman v. City of Peoria, Ill*., 925 F.3d 336, 344 (7th Cir. 2019). The due process

6

violation occurs where the evidence or law enforcement techniques cause a deprivation of liberty. *Armstrong v. Daily*, 786 F.3d 529, 546 (7th Cir. 2015). In the Seventh Circuit, a claim for fabrication was recognized as early as 2012, if not earlier. See *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

The defendants' first argument is that Defendant Schumacher did not fabricate the evidence because there is a possibility that he learned about Jesus Zambrano's whereabouts from other witnesses or codefendants and mistakenly attributed statements from the codefendants or witnesses about these whereabouts to Jesus Zambrano. There are two problems with this argument.

First, this argument is not based upon Schumacher's deposition or his declaration. He has never claimed that the information was derived from someone other than Jesus Zambrano. It is therefore rank speculation, unsupported by anything in the record.

Second, this argument obscures the clear credibility conflict between Jesus Zambrano and Schumacher. Schumacher says that Zambrano told Schumacher his whereabouts; Jesus Zambrano says he did not. This is a classic example of a "He Said/He Said" conflict which cannot be resolved on summary judgment.

The defendants next argue based upon the decisions in *Brown v. City of Chicago*, ", 18 C 7064, at *1 (N.D. Ill. Sep. 30, 2022) and *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) that the fabrication claims must fail because the fabricated police report was not "used against him" at trial. This claim is factually false.

Both Schumacher and Assistant States Attorney Walsh, the lead prosecutor in Jesus Zambrano's first trial, were deposed. Defendant Schumacher could not recall whether he kept a copy of his report, (PAF, ¶ 5 ), but had no reason to believe that the States Attorney who put him on to testify did not have a copy of the report. (PAF, ¶ 6). He also admitted that generally it is his practice to meet or speak with a States Attorney before he testifies. (PAF, ¶ 7). In his deposition,

Schumacher stated had no independent recollection of meeting with an Assistant States Attorney before he testified in the Robert Gooch murder case or whether the States Attorney he met with had a copy of his police report. (PAF, ¶ 9). And in the second trial, Schumacher admitted using the report to refresh his recollection. (PAF, ¶2 9).

And, according to Daniel M. Walsh, the lead prosecutor at Jesus Zambrano's first trial, it is part of his procedure to receive police reports in the cases that he tries. (PAF, ¶ 10). To prepare police officers to testify, Walsh would typically meet with police officers at his office ahead of time or he would talk with them on the phone. . (PAF, ¶ 12). Walsh could not recall any murder case in which he put a police officer on the stand without speaking with him first. . (PAF, ¶ 13). Walsh conceded that it would be poor idea to put a police officer on the stand without speaking with him first. (PAF, ¶ 14). And Walsh also conceded that he generally relied upon the accuracy of police reports when putting officers on the stand to testify. (PAF, ¶ 15).

Although Walsh had no specific memory of speaking with Patrick Schumacher before he testified, he had no reason to believe that he did not speak with Schumacher before Schumacher testified. (PAF, ¶ 18). Walsh reviewed Patrick Schumacher's report in the Robert Gooch murder case and although he did not specifically remember reviewing the report before Schumacher testified he was virtually certain that he would have reviewed that report. (PAF, ¶ 19). To the best of Walsh's belief, the information that Patrick Schumacher put in his report and whatever Walsh told him before he testified is the information he used and was guided in in terms of presenting Schumacher's testimony. (PAF, ¶ 21).

Defendants ignore the depositions of Walsh and Schumacher, which they signally have omitted to attach as exhibits to their motion. Instead, they rely on sworn declarations of Walsh and Schumacher which contradict their depositions.

This blatant attempt to hide the ball from the court should fool no one. And the use of these

8

sworn contrary declarations violates the "sham affidavit" rule. See *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020); Every federal court of appeals, including the Seventh Circuit, permits a judge to disregard a "sham" affidavit—typically an affidavit that contradicts prior deposition testimony. *James*, 959 F.3d at 315-16; In the Seventh Circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018).

Defendants claim as an uncontested fact that the prosecution did not "use the report in any way during Jesus Zambrano's criminal trial." SOF, ¶ 52, This is a misrepresentation of the declarations of Schumacher and Walsh and, to the extent, that it is accurate, the declarations contradict their sworn depostions and are therefore shams.

SOF, ¶ 52 is based on Schumacher's affidavit that he did not have his police report "on the witness stand" and that the report was not used to "refresh his recollection." (Exhibit C, ,¶ ¶ 35, 38). These statements of course contradict Schumacher's deposition testimony that he had no memory of whether the report was even available to him at trial or whether he met with a States Attorney prior to taking the stand. He did concede, as a matter of practice, that both these things would normally occur. But in addition, Schumacher's declaration hardly precludes the strong likelihood that the reports were used to convey to the prosecutors the substance of Schumacher's testimony and/or that he reviewed them with the prosecutors prior to taking the stand. Schumacher conceded that it was his general practice to review his testimony with prosecutors before testifying and that he had no reason to believe that he had not met with a prosecutor before testifying and that the prosecutor did not have a copy of his report.

The declaration of Danial Walsh, the other source cited for SOF, ¶ 52 is even more contradictory to his sworn deposition testimony. In his declaration, he states that he did not conduct the direct examination of Patrick Schumacher and did not prepare him for trial testimony. (Exhibit

9

D, ¶ 8). But this declaration directly contradicts his deposition testimony that Walsh had no specific memory of speaking with Schumacher before he testified but that he had no reason to believe that he did not speak with Schumacher before Schumacher testified. (PAF, ¶ 18). It also contradicts his testimony that he reviewed Patrick Schumacher's report in the Robert Gooch murder case and although he did not specifically remember reviewing the report before Schumacher testified but he was virtually certain that he would have reviewed that report. (PAF, ¶ 19). before Patrick Schumacher took the stand. (PAF, ¶ 20). And to the best of Walsh's belief, the information that Patrick Schumacher put in his report and whatever Walsh told him before he testified is the information he used and was guided in in terms of presenting Schumacher's testimony. (PAF, ¶ 21).

Moreover, the mere fact that it was Walsh's partner who actually asked questions of Schumacher when he testified hardly precludes the strong likelihood that Walsh, consistent with this deposition testimony, participated with his partner is preparing Schumacher to testify, and used his false police report.

The defendants urge this court to follow *Brown* in holding that the mere fact that Schumacher testified consistently with his false report is not sufficient to support a fabrication of evidence claim because the report itself was not introduced into evidence and was not sued to refresh Schumacher's recollection when he testified.

But the facts here are distinguishable from *Brown* because in this case there is deposition testimony which raises a question of fact as to whether Schumacher's report was used in preparing him to testify and in shaping and guiding his testimony on the stand. Critically, Walsh testified at his deposition that the information that Patrick Schumacher put in his report and whatever Walsh told him before he testified is the information he used and was guided by when presenting Schumacher's testimony. (PAF, ¶ 21). No similar testimony was presented in *Brown*.

More importantly, to accept *Brown* as good precedent would undercut nearly all fabrication

10

of evidence claims and would expand testimonial immunity so as to enable police officers to convey false information to prosecutors and to juries. As this court ruled when denying defendants' motion to dismiss: "even if the statements in the report and to the prosecutors weren't directly entered into evidence for the jury, they got the ball rolling toward prosecution. And nothing broke that chain of causation, according to the complaint." (ECF, 38).

Lastly, the defendant argues that the police report did not have a material impact on the guilty verdict. This argument is also not well taken.

This argument seems to based upon Dan Walsh's declaration, and his opinion, that the allegedly false statements did not have a material impact upon the verdict, although defendants do not explicitly cite this "fact" as an opinion. But Walsh was never disclosed as an expert, and expert discovery closed without either side advancing or naming any expert witness. Therefore, Walsh's opinion is inadmissible. If the court should elect to consider it, discovery would have to be reopened to allow Jesus Zambrano to put in evidence of a counter expert. (See ECF # 76).

The defendants explicitly argue that the false report had no impact upon the verdict because it was not used to establish probable cause for Jesus Zambrano's arrest. But this is a non-sequitur. Jesus Zambrano is not claiming an unlawful arrest or an unlawful detention prior to an acquittal. He is claiming a wrongful conviction based upon fabricated evidence. Thus, the issue is whether the fabrication lead to his conviction, not whether the fabrication lead to his arrest. The defendants' cited case, *Massey v. Ojanlit*, 759 F.3d 343, 357 (4th Cir. 2014), which deals with a fourth amendment, and not a fourteenth amendment due process, fabrication claim, is therefore not on point.

Defendants next argue that Schumacher's testimony was not material because he was called to establish that the police had attempted to administer a GSR test to Jesus Zambrano (and bungled it) and that his testimony as to his conversation with Zambrano was simply "background"

11

information.

This argument is not well taken. Schumacher testified, without any rebuttal that Zambrano had admitted to being in the company of Pedro Sanchez and Michael Ortiz the "night before" May 22. Since the murder was committed shortly after midnight on May 22, these alleged statements by Zambrano placed him in the company of the two other people, Sanchez and Ortiz, whom Christian Lopez claimed were present with Lopez and Zambrano during the murder. Inculpatory statements by criminal defendants are usually deemed "powerful" evidence of guilt. See *Harris v. Thompson*, 698 F.3d 609, 631 (7th Cir. 2012*); Frison v. Williams*, No. 12 C 285, at *12 (N.D. Ill. July 24, 2015); *United States v. Fleming*, 594 F.2d 598, 603 (7th Cir. 1979).

Moreover, since Sanchez, not Zambrano was identified as the actual shooter and alone had a motive to commit the murder, evidence that Zambrano was in the company of Sanchez for an extended period of time was exceptionally probative on the issue of whether Zambrano was accountable for Sanchez. Accountability may be established by evidence of e defendant's presence during the commission of the crime, continued close association with other offenders after the commission, the defendant's failure to report the crime, and the defendant's flight from the scene. *People v. Jones*, 2015 IL App. 142597, ¶ 22.

The defendants next argue that the fabricated statements were immaterial because two other pieces of evidence, the McDonald's surveillance video and the Larkin apartments surveillance video placed Jesus Zambrano closer in time and place to the scene of the murder than did Schumacher's claims as to Jesus Zambrano's statements. But defendants have not attached either video in support of their motion for summary judgment. Instead they rely on Walsh's opinion that the McDonald's video "clearly" depicted Jesus Zambrano and his statement that the driver of the car in the Larkin apartments video wore the same clothes as worn by Jesus Zambrano in the McDonald's video.

This opinion testimony, without the videos themselves, is insufficient to support summary

12

judgment. That the first jury was unsure of what the videos depicted is demonstrated by the fact that they requested to see both videos during deliberations and had to go through them "frame by frame" in order to reach a guilty verdict. (SOF, ¶ 55). Under these circumstances, Schumacher's testimony that Zambrano had admitted being with Sanchez and Ortiz shortly before the murders may well have been the straw that broke the camel's back and tipped the verdict towards guilty.

The defendants next argue that Schumacher's testimony was inconsequential because Jesus Zambrano's conviction rested instead upon the testimony of Christian Lopez that he accompanied Jesus Zambrano, Pedro Sanchez, and Michael Ortiz to the scene of the murder. But this argument misses a key point – as defendants acknowledge – Lopez was heavily impeached. (PAF, ¶34). Schumacher's corroborating testimony that Jesus Zambrano had admitted to Schumacher that he was with Sanchez and Ortiz just before the murders may well have been critical.

The defendants' next argument is that Jesus Zambrano's conviction relied upon testimony that he attempted to flee to Mexico. But this testimony was weak. Norma Zambrano testified, without rebuttal, that she had forced Jesus Zambrano to accompany her to Mexico, shave his hair, and give a false name, all without telling him that there was a warrant for his arrest. (PAF ¶33), Under these circumstances, it is arguable that this evidence of attempted "flight" should not even have been admitted.

Defendants next argue that Zambrano's testimony was inconsequential because the prosecutors at the first trial failed to mention Schumacher's testimony in opening or closing argument. But this is simply not true, and Walsh's sham declaration to the contrary is belied by the trial record.

Prosecutors McKenna and Walsh both mentioned Schumacher's testimony as to his alleged conversation with Jesus Zambrano in their closing arguments. (PAF ¶¶ 30, 32). Both used it to argue that it demonstrated Zambrano's association with Pedro Sanchez and suggested accountability. But

13

in addition, both argued that Zambrano's failure to provide Schumacher with his whereabouts during the murder demonstrated consciousness of guilt. Although objections to these arguments were sustained in each instance, the repetition of this argument after the sustained objection, vitiated the trial court's ruling and prejudiced Jesus Zambrano. *People v. Larry* , 218 Ill. App. 3d 658, 663 (1991). Indeed, "driving a nail into a board and then pulling the nail out does not remove the hole*."* *People v. Cepek* , 57 Ill. 560, 570 (1934).

It is true that the prosecutors at Jesus Zambrano's second trial, unlike the prosecutors at the first trial did not mention Schumacher's testimony. But since Zambrano was convicted at the first trial and acquitted at the second trial, this difference is strong evidence that Schumacher's fabrication was material.

Defendants next argue that point to Jesus Zambrano's failure to raise a fabrication claim on his direct appeal as evidence that fabrication was not material. Bu Jesus Zambrano did not testify at trial, and therefore there was no evidence of fabrication in the record. Evidence *de hors* the record could not have been raised on direct appeal. *See People v. Ligon*, 239 Ill. 2d 94, 104 (2010). It was impossible for Jesus Zambrano to raise this issue on direct appeal.

Lastly, the defendants rely upon several cases in support of their argument that the false statements were not material.: *Holland v. City of Chicago*, 643 F.3d 248, 250 (7th Cir. 2011) *Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) and *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011). These cases are all distinguishable. See *Holland*, 643 F.3d at 250 (even had the trial judge heard evidence that the complainant was coerced, this testimony could not have overcome the complainant's testimony that she was afraid of defendant); *Freesmeyer*, 773 F.3d at 507 (suppression of failed polygraph by alternative suspect was not material where it could not have been admitted and alternate suspect had an airtight alibi); *Smith*, 640 F.3d at 939. (evidence of prior dumpster fires was not material where defendant was linked to charged fire by physical and prior

fires were substantially different in character).

    Therefore, the motion for summary judgment should be denied.

    Respectfully submitted,

>  JESUS ZAMRANO
> /s/ Stephen L. Richards
> By: Stephen L. Richards Attorney for Plaintiff
> 53 West Jackson
> Suite 756
> Chicago, IL 60604
> 773-817-6927
> sricha5461@aol.com
> Attorney No: 6191946

CERTIFICATION OF COUNSEL

The undersigned, Stephen L. Richards hereby certifies that the following document,

**PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

was served on August 14, 2023 in accordance with Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), pursuant to the district court's ECF system as to ECF filers, and was sent by first-class mail or by hand delivery to non-ECF filers, if any.

/s/ Stephen L. Richards