**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JESUS ZAMBRANO,

Plaintiff,

v.                                                    Case No. 21-cv-4496

CITY OF JOLIET and PATRICK
SCHUMACHER,                                  Hon. Steven Seeger,
                                             Judge Presiding

Defendants

**PLAINITFF'S  LOCAL RULE 56.1 (b)(2)(3)  RESPONSE TO STATEMENT OF
MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND STATEMENT  OF ADDITIONAL MATERIAL
FACTS**

Pursuant to Local Rule 56.1(b)(2)(3) in opposition to the motion for summary judgment

brought by defendants City of Joliet and Patrick Schumacher, plaintiff Jesus Zambrano by and

through Stephen L. Richards presents the following Response to the Statement of Material Facts

and Additional Material Facts, pursuant to local Rule 56.1(b)(2)(3).

Defendants' Exhibits A-H are incorporated by reference in this response. In addition

Plaintiff attaches the following additional exhibits:

Exhibit I: Deposition of Patrick Schumacher

Exhibit J: Deposition of Daniel Walsh

Exhibit K: Report of Proceedings, Appeal No 3-14-0049 (Jesus Zambrano's first trial).

1

*Parties, Jurisdiction, and Venue*

1.      Jurisdiction and venue are not disputed as this action is properly before this Court. ECF. No. 57, ¶¶ 2-3.

**ADMITTED**

2.       Plaintiff is a citizen of Will County, Illinois. [*See* Plaintiff's Deposition Transcript, ("**Exhibit A**") at 14: 3-8]

**ADMITTED**

3.      The City of Joliet is a local governmental entity. ECF. No. 57, ¶ 6.

**ADMITTED**

4.      Defendant Patrick Schumacher is employed by the City of Joliet's Department of Police as a Detective. [*See* Patrick Schumacher's Affidavit ("**Exhibit C**")]

**ADMITTED**

*Robert Gooch Murder Investigation*

5.      On May 22, 2009, at around 1:00 a.m., police were notified that Robert Gooch was murdered at his girlfriend, Elissa Hinton's apartment located at Larkin Apartments, 1007 Lois Place, Apartment #309, Joliet, IL 60435. **Ex. C, ¶ 4**

**ADMITTED**

6.      Shawn Filipiak, Detective for Joliet Police Department, was the lead detective in the murder investigation of Robert Gooch. **Ex. C, ¶ 6**

**ADMITTED**

7.      Defendant Schumacher was one of many detectives assigned to assist Shawn Filipiak in Robert Gooch's murder investigation. **Ex. C, ¶ 5**

**ADMITTED IN PART, DISPUTED  IN PART.**

According to Defendant Schumacher's declaration, on "May 22, 2009 I  was assigned to assist in

the murder investigation of Robert Gooch." **Ex. C, ¶ 5**. The declaration does not say that Schumacher was one of "many" detectives.

8.      On May 22, 2009, at approximately 3:00 p.m., Defendant Schumacher, Detective Ponce, Lt. Roechner, Officer Reilly, Detective Diehl, and Sgt. Reid went to Plaintiff's residence to investigate the murder of Robert Gooch. **Ex. C, ¶ 7**

**ADMITTED**

9.      When the officers arrived, Plaintiff, his mom – Norma Zambrano, Pedro Sanchez and Michael Ortiz were at his residence. **Ex. C, ¶ 8**

**ADMITTED**

10.      While at the residence, Defendant Schumacher had a conversation with the Plaintiff. Plaintiff communicated to Schumacher that in the afternoon hours of May 21, 2009, he was with his friends, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. **Ex. C, ¶ 9**

**DISPUTED**

**Ex. J., 106:24, 107:1-24, 115-14-24, 116:1-24, 117:1-6, 108:19-24, 109:1-24, 110:1-24, 11:1-19**

11.      Defendant Schumacher did not ask Plaintiff about his whereabouts during the time of the murder. **Ex. C, ¶ 11**

**DISPUTED**

 **Ex. J., 106:15-23**

12.      Following this brief conversation, Plaintiff agreed to go to the Joliet Police Department for a more in-depth interview. **Ex. C, ¶ 12**

**DISPUTED**

13.      While at the Joliet Police Department, Defendant Schumacher read Plaintiff his

rights and Plaintiff then refused to speak with Defendant Schumacher. **Ex. C, ¶ 13**

**OBJECTION. RELEVANCE**

14.     Plaintiff was released from the Joliet Police Department without any charges. **Ex. 12.** During the brief conversation, Plaintiff agreed to go to the Joliet Police Department for a more in-depth interview.

**DISPUTED**

   **Ex. J., 103:6-23, 104:1-24, 105:1-10**

15.     Later that day, Defendant Schumacher went to Claudia Sanchez's residence, located at the 800 block of N. Bluff in Joliet, Illinois. Claudia Sanchez confirmed that Plaintiff was at her apartment on May 21, 2009 with Pedro Sanchez, Michael Ortiz and Christian Lopez. Claudia Sanchez was presented with four different photo lineups and positively identified Plaintiff, Pedro Sanchez, Michael Ortiz and Christian Lopez as the individuals who were at her residence on May 21, 2009. **Ex. C, ¶¶ 15-16**

**ADMITTED**

16.     Defendant Schumacher also spoke with Latoya Ortiz who also resides at the apartment with Claudia Sanchez. Like Ms. Sanchez, Latoya Ortiz confirmed that Plaintiff was at her apartment on May 21, 2009 with Pedro Sanchez, Michael Ortiz and Christian Lopez. Latoya Ortiz was also presented with four different photo lineups and positively identified Plaintiff, Pedro Sanchez, Michael Ortiz and Christian Lopez as the individuals who were at her residence on May 21, 2009. **Ex. C, ¶ 17**

**ADMITTED**

17.     On May 22, 2009, at 10:10 p.m. Detective Schott and Defendant Schumacher interviewed Christian Lopez who confirmed Plaintiff's involvement in the murder of Robert

4

Gooch. Specifically, Christian Lopez confirmed that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana. **Ex. C, ¶¶ 18-19**

**ADMITTED**

18.    Lopez stated that after Claudia Sanchez's residence, Plaintiff drove him, Pedro Sanchez and Michael Ortiz to McDonald's and then went to Larkin Apartments. **Ex. C, ¶ 20**

**ADMITTED**

19.    While at Larkin Apartments, Lopez stated that he observed Plaintiff retrieve a gun from the hood of the car where he, along with Lopez and Sanchez proceeded to go into the apartment complex. Lopez stated that Plaintiff and Sanchez went up the stairs to the third floor of the apartment complex, but he stayed at the bottom of the stairs. Lopez stated that the next thing he heard was a gunshot and saw Plaintiff and Sanchez run downstairs to the car. **Ex. C, ¶ 21**

**ADMITTED**

20.    Lopez then stated that Zambrano, put the gun back into the hood of the vehicle and drove everyone back to Plaintiff's house where they spent the night. **Ex. C, ¶ 22**

**ADMITED**

21.    Based on the information obtained through Christian Lopez, Detective Schott obtained an arrest warrant for Plaintiff on May 26, 2009. **Ex. C, ¶ 23**

**ADMITTED**

22.    Defendant Schumacher's involvement in the Robert Gooch murder investigation is memorialized in his police report that was prepared on May 23, 2009. **Ex. C, ¶ 24**

**ADMITTED**

23.    The information located in Defendant Schumacher's police report is true and accurate. **Ex. C, ¶ 25**

5

**ADMITTED IN PART, DISPUTED IN PAET**

**Ex. J., 106:24, 107:1-24, 115-14-24, 116:1-24, 117:1-6,  108:19-24, 109:1-24, 110:1-24, 11:1-19**

**Ex. J., 103:6-23, 104:1-24, 105:1-10**

The following information located in Defendant Schumacher's report was not true and accurate:

The italicized portions of Defendant Schumacher's statements were false:

> "*I advised Zambrano that he was not in custody and he was free to leave at any point. I asked him if he would have a seat in the back of Sgt. Reid's unmarked squad car and he agreed to speak with me. At about that time, I reiterated to him again that he was not under arrest*. Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. *Zambrano stated to me that he was with his friends, PEDRO and MICHAEL.* (it should be noted Pedro Sanchez and Michael Ortiz  were present at the Zambrano's residence when we made contact with Zambrano and his mother. *Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River*. Zambrano stated that he had several icehouse beers and had smoked some marijuana *while at Claudia's house* however he was not intoxicated. *He stated that he and his friends had gone to Claudia's house and that they then returned to his house at 1025 N. Raynor*."

> [*See* Patrick Schumacher's Police Report ("**Exhibit B**")]

24.    Defendant Schumacher had no reason to believe that any information in his police report was false. **Ex. C, ¶ 26**

**DISPUTED**

**Ex. J., 106:24, 107:1-24, 115-14-24, 116:1-24, 117:1-6,  108:19-24, 109:1-24, 110:1-24, 11:1-19**

**Ex. J., 103:6-23, 104:1-24, 105:1-10**

25.    When Defendant Schumacher arrived at Plaintiff's residence on May 22, 2009, Plaintiff, Michael Ortiz and Pedro Sanchez were all there. Defendant Schumacher recalls that Plaintiff gestured to him that he was with these guys – referring to Michael Ortiz and Pedro Sanchez – in the afternoon hours of May 21, 2009 at Claudia Sanchez's residence located near the

area of Ruby St. and the westside of the Des Plaines River. **Ex. C, ¶ 10**

**ADMITTED IN PART, DISPUTED IN PAET**

Jesus Zambrano admits that "When Defendant Schumacher arrived at Plaintiff's residence on May 22, 2009, Plaintiff, Michael Ortiz and Pedro Sanchez were all there." Jesus Zambrano disputes the remainder.

**Ex. J., 106:24, 107:1-24, 115-14-24, 116:1-24, 117:1-6, 108:19-24, 109:1-24, 110:1-24, 11:1-19 Ex. J., 103:6-23, 104:1-24, 105:1-10**

26.     Based on Detective Schumacher's investigation, he uncovered no evidence to suggest or contradict his police report that Plaintiff was not with Michael Ortiz and Pedro Sanchez in the afternoon hours of May 21, 2009 at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. **Ex. C, ¶ 27**

**DISPUTED**

**Ex. J., 106:24, 107:1-24, 115-14-24, 116:1-24, 117:1-6, 108:19-24, 109:1-24, 110:1-24, 11:1-19 Ex. J., 103:6-23, 104:1-24, 105:1-10**

27.     During the investigation, Defendant Schumacher attempted to perform a GSR test on Jesus Zambrano and Christian Lopez. However, instead of using a GSR kit, Schumacher used a fingernail swabbing kit. As a result, Schumacher did not obtain a sample from either Zambrano or Lopez because he used the wrong testing kit. **Ex. C, ¶ 29**

**ADMITTED**

28.     Defendant Schumacher was not involved in obtaining the arrest warrant for Plaintiff. **Ex. C, ¶ 30**

**ADMITTED**

29.     Defendant Schumacher did not testify at Plaintiff's grand jury proceedings. **Ex. C, ¶ 31.**

**ADMITTED**

30.     Defendant Schumacher's police report did not provide the Will County State's Attorney's Office with probable cause to obtain Jesus Zambrano's arrest warrant because his police report fails to put Zambrano at the scene of the murder. **Ex. C, ¶ 28; Ex. D, ¶ 7**

**OBJECTION. STATES A LEGAL CONCLUSION RATHER THAN A STATEMENT OF FACT**

31.     On May 26, 2009, Joliet Police Officers went to Plaintiff's home to arrest him, but he was not there. Instead, the officers spoke with Norma Zambrano who assured the officers that Plaintiff would turn himself in. [*See* First Criminal Trial Transcript ("**Exhibit E**")], **pgs. 239-243 (Lead Detective Filipiak Testimony)**

**ADMITTED**

32.     Instead, on or around May 27, 2009, the Joliet Police Department (JPD) were notified that Plaintiff, Norma Zambrano and his grandma fled the residence in a red vehicle. As a result, JPD entered the red vehicle into a data base that allowed all officers within the United States to be on the lookout ("BOLO") for said vehicle. **Ex. E**, **pgs. 168-187 (Trooper Lantz Testimony)**
**ADMITTED**

33.     On May 28, 2009, Texas State Trooper Jon Lantz saw the car matching the vehicle in question and pulled it over. In the car were two females and one male occupant. **Ex. E**, **pgs. 168-187 (Trooper Lantz Testimony).**
**ADMITTED**

34.     The male occupant shaved his head and did not have any identification. Trooper Lantz requested the male occupants name, who stated that his name was "Juan." **Ex. E**, **pgs. 176-178 (Trooper Lantz Testimony)**

**ADMITTED**

35.     Trooper Lantz placed the male occupant under arrest and after obtaining his fingerprints, determined that this person was the Plaintiff, Jesus Zambrano. **Ex. E, pgs. 177, 178**

**(Trooper Lantz Testimony)**

**ADMITTED**

*Defendant Schumacher's Police Report and Plaintiff's Admissions*

36.     Detective Schumacher's police report states the following:

"I advised Zambrano that he was not in custody and he was free to leave at any point. I asked him if he would have a seat in the back of Sgt. Reid's unmarked squad car and he agreed to speak with me. At about that time, I reiterated to him again that he was not under arrest. Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. Zambrano stated to me that he was with his friends, PEDRO and MICHAEL. (it should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother. Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River. Zambrano stated that he had several icehouse beers and had smoked some marijuana while at Claudia's house however he was not intoxicated. He stated that he and his friends had gone to Claudia's house and that they then returned to his house at 1025 N. Raynor."

[*See* Patrick Schumacher's Police Report ("**Exhibit B**")]

**ADMITTED**

37.     Plaintiff admits that he spoke with Detective Schumacher on May 22, 2009, at approximately 3:00 p.m. outside his residence. **Ex. A, 104: 17-21**

**ADMITTED**

38.     Plaintiff admits that on May 21, 2009, he was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. **Ex. A, 108: 12-18; 109: 14-22**

**ADMITTED**

39.    Plaintiff admits that he was drinking beer and smoking marijuana while at Claudia's residence. **Ex. A,  111: 20-23**

**ADMITTED**

40.    Plaintiff admits that when he left Claudia Sanchez's residence, he drove Pedro Sanchez, Michael Ortiz and Christian Lopez to the McDonalds in Joliet, Illinois. **Ex. A,  81:22-82: 16**

**ADMITTED**

41.    Plaintiff admits that he is the driver depicted in the McDonald's video that was entered into evidence as People's Exhibit 4 in his first criminal trial. **Ex. A,  85: 4-11**

**ADMITTED**

42.    On January 31, 2011, Plaintiff's counsel – Cosmo Tedone – admitted during a court proceeding that Plaintiff made a brief statement to the officer where he indicated that "he was with his friends, Pedro and Michael. Zambrano then stated that they had gone to a girls house names Claudia who lived somewhere around Ruby Street on the west side of the Des Plaines River." [*See* Pre-Trial Transcript ("**Exhibit G**")]

**ADMITTED**

Plaintiff's First Criminal Trial

43.    Daniel Walsh and Tricia McKenna were assigned to prosecute Plaintiff for first degree murder in the first criminal trial, People of the State of Illinois vs. Jesus Zambrano, Case Number 2009-CF-001193. [*See* Dan Walsh's Affidavit ("**Exhibit D**" ¶ 3)]

**ADMITTED**

44.    The criminal trial began on August 12, 2013 and concluded on August 20, 2013 when the jury found Jesus Zambrano guilty of first degree murder. **Ex. D, ¶ 4**

**ADMITTED**

45. ASA Walsh and ASA McKenna put the following witnesses on in their case in chief:

    a. Francis Ferro – JPD Officer
    b. Dennis Laughlin – Property manager at Larkin Apartments
    c. Horacio Vargas – Supervisor at McDonald's
    d. Lisa Giovingo – JPD Evidence Technician
    e. James Stewart – Will County State's Attorney's Office Investigator
    f. Elissa Hinton – Resident at Larkin Apartments
    g. Eric Stanley – JPD Evidence Technician
    h. Jon Lantz – Texas State Trooper
    i. Robert Brenczewski – Chief Deputy at Will County Coroner's Office
    j. Dr. Scott Denton – People's Expert on Forensic Pathology
    k. Moises Avila – JPD Officer
    l. Tom Ponce – JPD Detective
    m. Patrick Schumacher – JPD Detective
    n. Shawn Filipiak – JPD Lead Detective
    o. Christian Lopez – Witness to Murder
    p. Mary Wong – People's Expert Witness on Forensic Science
    q. Chris Botzum – JPD Computer Forensic Examiner

**Ex. E, pgs. 1-387**

**ADMITTED**

46. Zambrano's counsel – Charles Bretz - put the following witnesses on in his case in chief:

    a. Norma Zambrano
    b. Tom Ponce - JPD Detective
    c. Dennis Lauhglin - Property manager at Larkin Apartments
    d. Darrell Gavin – JPD Sgt.
    e. Edward Simon – Chief Legal Investigator for Zambrano's counsel
    f. Christopher Schott – JPD Detective
    g. Rochina Debartolo – Court Reporter

**Ex. E, pgs. 388-462**

**ADMITTED**

47. The following material exhibits were admitted into evidence:

    a. People's Exhibit 1 – Photograph of Apartment 309
    b. People's Exhibit 3 – Surveillance video of Larkin Apartments
    c. People's Exhibit 4 – Surveillance video of McDonalds
    d. People's Exhibit 14 – Trooper Lantz's Traffic Stop
    e. Defense Exhibit 3 - Surveillance video of Larkin Apartments

      f.   Defense Exhibit 4 – Photo of Pedro Sanchez

*See generally* **Ex. E**

**ADMIITED**

48.     During the criminal trial, ASA McKenna chose to call Patrick Schumacher as a witness because of his involvement with performing the GSR test. A GSR test detects the presence of distinctive chemicals that are deposited on a person's skin or clothing when a gun is fired. **Ex. C, ¶ 33**

**OBJECTION RELEVANCE**

49.     During the trial, Defendant Schumacher testified that he attempted to perform a GSR test on Jesus Zambrano and Christian Lopez. However, instead of using a GSR kit, Schumacher used a fingernail swabbing kit. As a result, Schumacher did not obtain a sample from either Zambrano or Lopez because he used the wrong testing kit. **Ex. C, ¶ 29**

**ADMITTED**

50.     During the trial, Defendant Schumacher also testified to the following interaction with Jesus Zambrano:

> Q. On May 22, 2009, did you have occasion to go to 1025 North Raynor in your course of investigating the homicide?
> A: Yes
> Q: And whose residence was that?
> A: The residence of Jesus Zambrano
> Q: When you arrived at the residence of 1025 North Raynor, who was present?
> A: Jesus Zambrano, Norma Zambrano, Pedro Sanchez and Michael Ortiz
> Q: Did you speak to anybody?
> A: Yes
> Q: Who did you speak to?
> A: Jesus Zambrano
> Q: Did you speak with Jesus Zambrano in front of the other people?
> A: I don't recall if they were present for all the conversation, but at a point, I did speak with Mr. Zambrano away from the other people
> Q: And was he in custody when you talked to him?
> A: No
> Q What did you ask him?

A: I advised that his name has com…excuse me, come up in an investigation and that I wished to speak with him.
Q: And did you ask him any questions?
A: Yes, I asked him where he was the night prior
Q: So, that would have been the evening of May 21, 2009?
A: Yes
Q: Did he answer that question?
A: Yes
Q: What did he tell you?
A: He stated that he was with Miguel Ortiz and Pedro Sanchez and that they had left from his residence and went to a female's residence who he names…who he knew as Claudia, who lived off Ruby Street near the west side of the Des Plaines River.

**Ex. D, ¶ 8; Ex. E, pgs. 222-239**

**ADMITTED**

51. Based on the evidence available to ASA Walsh at the time of trial, he had no reason to believe that Defendant Schumacher's police report or above testimony was false. This evidence included witness statements from Christian Lopez, Michael Ortiz, Claudia Sanchez, and Latoya Ortiz who all confirmed that Plaintiff was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence on the evening of May 21, 2009. Additionally, Claudia Sanchez, and Latoya Ortiz positively identified Plaintiff, Michael Ortiz and Pedro Sanchez through a photo lineup. **Ex. D, ¶ 10**

**ADMITTED**

52. Detective Schumacher's police report was not admitted into evidence, nor did ASA's McKenna or Walsh use it during Zambrano's criminal trial. **Ex. C, ¶¶ 35, 38; Ex. D, ¶ 11**

**ADMITTED IN PART, DISPUTED IN PART**

Admitted that Schumacher's police report was not admitted into evidence. Disputed that McKenna or Walsh did not use it during Zambrano's criminal trial.

**Ex. I, 13:8-11, Ex. I, 14:19-24, 15:1, Ex. I,, 10:22-24, 11:1-3, 15: 2-13,**

**Ex. I, 15:14-16, Ex. I, 16:13-18, Ex. I, 13:19-24, 14:1, Ex. I, 14:2-18,**

**Ex. I, 17:3-23, Ex. J., 7:4-9, Ex. J., 7:10-22, 8:1-13, Ex. J., 8:14-21, 10;16-19, Ex. J, 8:22-24., 9:1-2, Ex. J, 9:3-8, Ex. J., 12:15-24, 13:1-24, Ex. J., 9:21-24, 10:1-7, Ex. J., 10: 8-11, Ex. J., 10:20-22 , Ex J., 12:9-14**

53. Schumacher's police report and testimony as to Plaintiff's whereabouts with Michael Ortiz and Pedro Sanchez at Claudia's residence did not have a material impact on the jury's guilty verdict. **Ex. D, ¶ 12**

**OBJECTION. VIOLATION OF DISCOVERY RULES**

54. First, the People admitted other pieces of evidence and elicited testimony that placed Plaintiff closer in time to the murder than Detective Schumacher's testimony. For example, the People admitted into evidence the surveillance video from the McDonald's drive through which clearly depicted Plaintiff as the driver of the gray cutlass vehicle at approximately 12:40 a.m., which was just fifteen minutes before the murder. **Ex. D, ¶ 13**

**OBJECTION. LEGAL CONCLUSION NOT STATEMENT OF UNCONTESTED FACT. OBJECTION HEARSAY**

55. Additionally, the People admitted into evidence the video surveillance from Larkin Apartments where the murder took place. This video showed the same gray cutlass vehicle arriving and leaving the scene of the murder. Importantly, the time stamps of these videos established that the gray cutlass arrived at 12:47 a.m. and left Larkin apartments at 12:54 a.m., which was during the time of the murder. **Ex. D, ¶ 14**

**OBJECTION . LEGAL CONCLUSION NOT STATEMENT OF UNCONTESTED FACT. OBJECTION HEARSAY**

56. The Larkin Apartments surveillance video depicted the driver of the gray cutlass, who was wearing the same clothes as Plaintiff in the McDonald's video, open the hood of the gray

cutlass and take what appeared to be a gun out of the vehicle and placed it in his waistband. This video further depicts the driver of the gray cutlass entering Larkin Apartments with the alleged handgun where the murder took place. The video further depicts the driver of the gray cutlass running out of Larkin Apartments and leaving the murder scene who placed the alleged handgun back into the hood of said vehicle. **Ex. D, ¶ 15**

> **OBJECTION HEARSAY.**

57.     ASA Walsh called Christian Lopez – the only eyewitness - to corroborate the video evidence and confirm that the driver of the gray cutlass was Plaintiff, which he did. Christian Lopez testified consistently with the SOF ¶¶ 16-19 and his testimony at trial was critical for obtaining Zambrano's guilty verdict. **Ex. D, ¶ 16; Ex. E, pgs. 275-347 (Christian Lopez Testimony)**

> **ADMITTED IN PART, OBJECTION IN PART, VIOLATION OF DISCOVERY RULES**    Admitted that "ASA Walsh called Christian Lopez – the only eyewitness - to corroborate the video evidence and confirm that the driver of the gray cutlass was Plaintiff, which he did." Objection as an undisclosed expert opinion that "Christian Lopez testified consistently with the SOF ¶¶ 16-19 and his testimony at trial was critical for obtaining Zambrano's guilty verdict."

58.     Detective Schott also testified during Plaintiff's criminal trial that during his conversation with Lopez, Lopez confirmed that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana. **Ex. E, pgs. 432-445 (Detective Schott Testimony)**

**ADMITTED**

59.     ASA Walsh called Joliet Police Department's Computer Forensic Examiner, Christopher Botzum who testified using scientific analysis that the gray cutlass in the McDonald's

surveillance video was the same gray cutlass in the Larkin Apartment surveillance video. **Ex. D, ¶ 19**

**ADMITTED**

60.     Trooper Lantz's testimony was critical in obtaining the guilty verdict because it confirmed the People's theme of the case, which was that guilty people, like Jesus Zambrano, flee and alter their appearance and identity. *See* SOF ¶¶ 33-35. **Ex. D, ¶ 21**

**OBJECTION. STATES LEGAL CONCLUSION  RATHER THAN TACT**

61.     ASA Walsh, ASA McKenna, and Plaintiff's Counsel Bretz did not rely on Schumacher's testimony during opening or closing arguments. **Ex. D, ¶¶ 22-23, 25**

**ADMITTED IN PART, DISPUTED IN PART**

ASA Walsh did not mention Schumacher's testimony during his opening statement.

During his opening statement, Counsel Bretz argued that there would be  no "reliable evidence" that Jesus Zambrano was ever present in the place where Rober t Gooch was killed, r hat he was "even in the building at the time the murder took place." **Exhibit E,  pg. 511.**

In her opening closing argument in Jesus Zambrano's first trial, prosecutor McKenna referred to Patrick Schumacher's testimony as follows:

"That afternoon, the day  of May 22, 2009, Detective Schumacher goes to talk to the defendant. When he gets there, the defendant is still with Pedro Sanchez; but Detective Schumacher gets him  away and talks to him alone. And the defendants doesn't say that Pedro Sanchez did anything or anything along those lines.

Mr. Bretz: Objection, Judge.

The Court: I will sustain the objection.

Mr. Bretz: I ask the jury to disregard.

Ms. McKenna: The defendant said that he was with Pedro the night before."

16

**Exhibit K, pg. 914**

In attorney Bretz's closing argument he referred to Patrick Schumacher's conversation with Jesus Zambrano on May 22 as follows:

"The third distinction between Jesus and Lopez is we know how Lopez lied and tried to direct attention away from himself. As to Jesus, there was no evidence presented other than he was questioned about the evening of May 21, and I specifically asked the detective if he talked to him about being at Lois Place during the early morning hours of May 22, 2009, and he said, no, which leads us to the fourth and final distinction between then."

**Exhibit K, pg. 939**

62.     The omission of Schumacher's testimony during opening and closing arguments establishes that his testimony was not material to the jury's guilty verdict. **Ex. D, ¶¶ 24-25**

**OBJECTION. STATES LEGAL ARGUMENT RATHER THAN TACT**

63.     During jury deliberations, the jury requested the following pieces of evidence:

    a.  McDonald's surveillance video
    b.  Larkin Apartments surveillance videos
    c.  Result of the Sanchez trial
    d.  All photographs

**Ex. D, ¶ 26**

**ADMITTED**

64.     The omission of the jury's request for Schumacher's testimony establishes that his testimony was not material to the jury's guilty verdict. **Ex. F, ¶ 27**

**OBJECTION. STATES LEGAL ARGUMENT RATHER THAN TACT**

65.     On January 8, 2014, Plaintiff's counsel argued for a new trial stating that: "[w]hat they did is to go through this frame by frame and back and forth and what the gentleman told me is they saw shadows and things that they were not able to see in Court and that was a ***primary***

17

*factor in making their decision."* (Plaintiff's counsel was referring to the Larkin Apartments surveillance video and the "gentleman" was a jury member in Plaintiff's criminal trial) *See* Post-Trial Transcript, **Exhibit H, pg. 14**

**ADMITTED**

*Criminal Appeal*

66.     Plaintiff appealed his guilty verdict arguing that: (1) his counsel failed to impeach Lopez with evidence that he received immunity to testify; and (2) failed to tender a jury instruction for accomplice liability. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 1.

**ADMITTED**

67.     Plaintiff did not argue on appeal that Detective Schumacher gave false testimony and/or created a false police report that was material to the jury's improper guilty verdict. *People v. Zambrano*, 2016 IL App (3d) 140178.

**OBJECTION, RELEVANCE**

68.     The Appellate Court of Illinois, Third District  reversed and remanded Plaintiff's conviction because of his counsel's "failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony." *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 33.

**ADMITTED**

*Second Criminal Trial*

69.     ASA's John Rickmon and Erin Krone were assigned to prosecute Plaintiff for first degree murder in the second criminal trial, People of the State of Illinois vs. Jesus Zambrano, Case Number 2009-CF-001193. [*See* Second Criminal Trial Transcript ("**Exhibit F**")].

**ADMITTED**

70.     The criminal trial began on August 22, 2019 and concluded on August 27, 2019

when the jury found Jesus Zambrano not guilty of first degree murder. *See generally* **Ex. F**

**ADMITTED**

71.     ASA Rickmon and ASA Krone put the following witnesses on in their case in chief:

a.  Francis Ferro – JPD Officer
b.  Patrick O'Neil – Will County Coroner

c.  Eric Stanley - JPD Evidence Technician
d.  Dr. Scott Denton – People's Expert on Forensic Pathology
e.  Dennis Laughlin – Property manager at Larkin Apartments
f.  Tom Ponce – JPD Detective
g.  Patrick Schumacher – JPD Detective
h.  Elissa Hinton – Resident at Larkin Apartments
i.  Horacio Vargas – Supervisor at McDonald's
j.  Moises Avila – JPD Officer
k.  Patricia Wallace – Joliet Forensic Scientist
l.  Christian Lopez – Witness to Murder
m.  Shawn Filipiak – JPD Lead Detective
n.  Lisa Giovingo – JPD Evidence Technician (prior testimony read by Officer Patrick Kelly)
o.  Mary Wong – People's Expert Witness on Forensic Science
p.  Chris Botzum – JPD Computer Forensic Examiner
q.  Jon Lantz – Texas State Trooper

**Ex. F, pgs. 1-370**

**ADMITTED**

72.     During the second criminal trial, Defendant Schumacher testified as follows:

Q During the course of your investigation, did
you have the opportunity to speak with Jesus Zambrano?
A Yes.
Q And do you recall where you spoke with him?
A I first spoke with him outside of 1025 North
Raynor Street in Joliet.
Q What day?
A On May 22nd of 2009.
Q Do you recall -- I'm sorry, what year?
A Of 2009.
Q Do you recall what time it was?
A Approximately 3:00 p.m.
Q When you arrived at that residence, who was
present?
A Jesus Zambrano, his mother Norma Zambrano, and
we later learned --

19

MR. BRETZ: Objection, Judge, as to we later learned.

THE COURT: I'll sustain it as to we later learned.

BY MR. RICKMON:

Q Did you subsequently talk to Jesus Zambrano?

A Yes.

Q And where did you speak with him?

A I originally spoke with Jesus Zambrano outside
of the residence for a brief period. And after a brief
conversation, we had a further conversation inside of then

Sergeant Reed's unmarked patrol car parked near the
residence.

Q And do you see Jesus Zambrano in court today?

A Yes.

Q Could you please point to him and describe
something he is wearing?

A Yes, he's the gentleman to Mr. Patel's left
with the glasses and blue collar shirt.

MR. RICKMON: May I ask the Court to note the
in-court identification.

THE COURT: The record will reflect the
identification.

Q When you spoke with him, were you able to
observe his physical characteristics?

A Yes.

Q What, if any, did you observe?

A The only thing that stands out of my mind at
the moment was that his hair was longer than normal length,
probably a little bit longer than his hair is at this time.

Q Did you ask him where he was the night of the
21st and into the 22nd?

A Yes.

Q Did he respond?

A Yes.

Q What was his response?

A He had stated that he was with several friends
of his, and they had gone to a girl's house named Claudia
near the area off of Ruby Street, just west of the DesPlaines
River.

Q Did he tell you who these friends were?

A Yes.

Q Who did he tell you they were?

A He stated he was with Pedro Sanchez and Miguel
Ortiz.

**Ex. F, pgs. 61 – 146 (Defendant Schumacher 2nd Trial Testimony)**

**ADMITTED**

20

73.     Zambrano's counsel – Charles Bretz - put the following witnesses on in his case in chief:

    a. Darrell Gavin – JPD Sgt.
    b. Patrick Schumacher – JPD Detective
    c. Gregory Humphrey – JPD Officer
    d. Edward Simon – Chief Legal Investigator for Zambrano's counsel
    e. Norma Zambrano

**Ex. F, pgs. 384-440**

**ADMITTED**

74.     Defendant Schumacher's direct examination by Mr. Bretz had nothing to do with his testimony regarding Plaintiff's May 22, 2009 conversation with Defendant Schumacher, but instead, was called to clarify that Michael Ortiz was arrested on May 22, 2009.

**ADMITTED**

**Ex. F, pgs. 394-397**

75.     The following material exhibits were admitted into evidence:

    a. People's Exhibit 1 – Photograph of Apartment 309
    b. People's Exhibit 22-23 – Surveillance video of Larkin Apartments
    c. People's Exhibit 33 – Surveillance video of McDonalds
    d. People's Exhibit 42 – Trooper Lantz's Traffic Stop
    e. Defense Exhibit 3 – Videotape of Elissa Hinton's Testimony
    f. Defense Exhibit 5 – Photo of Pedro Sanchez
    g. Defense Exhibit 7 – Hufford Junior High Yearbook

*See generally* **Ex. F**

**ADMITTED**

76.     ASA Rickmon and ASA Kone did not rely on Schumacher's testimony during closing or rebuttal arguments.

**Ex. F, pgs. 459-468, 505-516**

**ADMITTED**

77.     During jury deliberations, the jury requested the following questions and pieces of

21

evidence:

> a.  More direction as to what constitutes a "plan."
> b.  Larkin Apartments surveillance videos
> c.  Trial transcript of Elissa Hinton
> d.  Trial transcript of Christian Lopez

**Ex. F, pgs. 529-549**

**ADMITTED**

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1.  Defendant Schumacher identified a document marked as Exhibit A in his deposition as the police report he generated during the investigation of the murder of Robert Gooch.

    **Ex. I., 11:4-6, 13-24, 12:1-23**

2.  Once a police report is generated, part of defendant Schumaker's job is to go to court and to testify.

    **Ex. I., 13:8-11**

3.  After a report is generated, it, the original copy is kept in the Records Department of the Joliet Police Department.

    **Ex. I., 14:19-24, 15:1**

4.  A working copy of the report would have been kept with the lead detective in the case, in this instance, Shawn Filipiak. Defendant Schumacher had no reason to believe that Shawn Filipiak did not have a copy of Schumacher's report.

    **Ex. I,, 10:22-24, 11:1-3, 15: 2-13**

5.  Defendant Schumacher could not recall whether he kept a copy of his report.

    **Ex. I, 15:14-16**

6.  Defendant Schumacher had no reason to believe that the States Attorney who put him on to testify did not have a copy of Schumacher's report.

22

**Ex. I, 16:13-18**

**7.** Defendant Schumacher admitted that generally it is his practice to meet or speak with a States

Attorney before he testifies.

**Ex. I, 13:19-24, 14:1**

8. Defendant Schumacher could not "say for sure" whether or not he met with a States Attorney

every time he testified at trial. He had testified at trial 50 to 100 times.

**Ex. I, 14:2-18**

9. Defendant Schumacher had no independent recollection of meeting with an Assistant States

Attorney before he testified in the Robert Gooch murder case or whether the States Attorney he

met with had a copy of his police report.

**Ex. I, 17:3-23**

10. According to Daniel M. Walsh, the lead prosecutor at Jesus Zambrano's first trial, it is part of

his procedure to receive police procedures in the cases that he tries.

**Ex. J., 7:4-9**

11. A secretary in the States Attorney's Office would order police reports from the police

department and then the file would be given to whoever was assigned to the case.

**Ex. J., 7:10-22, 8:1-13**

12. To prepare police officers to testify, Walsh would typically meet with police officers at his office

ahead of time or he would talk with them on the phone.

**Ex. J., 8:14-21, 10;16-19**

13. Walsh could not recall any murder case in which he put a police officer on the stand without

speaking with him first.

**Ex. J, 8:22-24., 9:1-2**

14. Walsh conceded that it would be poor idea to put a police officer on the stand without speaking

with him first.

**Ex. J, 9:3-8**

15. Walsh generally replied upon the accuracy of police reports when putting officers on the stand to testify.

**Ex. J., 12:15-24, 13:1-24**

16. Walsh was very familiar with defendant Patrick Schumacher

**Ex. J.,  9:21-24, 10:1-7**

17. Patrick Schumacher was one of the witnesses who testified in Jesus Zambrano's first trial.

**Ex. J., 10: 8-11**

18. Although Walsh had no specific memory of speaking with Schumacher before he testified, he had no reason to believe that he did not put Schumacher on the stand before Schumacher testified.

**Ex. J., 10:20-22**

19. Walsh reviewed Patrick Schumacher's report in the Robert Gooch murder case and although he did not specifically remember reviewing the report before Schumacher testified he was virtually certain that he would have reviewed that report.

**Ex J., 12:9-14**

20. Walsh was virtually certain that this was the  report he would have reviewed before he put Patrick Schumacher on the stand.

**Ex. J., 12:9-20**

21. To the best of Walsh's belief, the information that Patrick Schumacher put in his report and whatever Walsh told him before he testified is the information he used and was guided in terms of presenting Schumacher's testimony.

**Ex. J., 14:1-6**

22. On May 22, 2009, at about 3:00 p.m., Defendant Schumacher talked to Jesus Zambrano in the front driveway area of his house at 1025 north Raynor.

**Ex. J., 102:19-24, 103:1-3**

23. The interaction between Schumacher and Jesus Zambrano consisted of the exchange of a couple of sentences.

**Ex. J., 102:5-7**

24. The interaction was more of an interrogation than a conversation.

**Ex. J., 102:9-17**

25. Patrick Schumacher's statements in his police report that he asked Jesus Zambrano to get into the back seat of Sergeant Reed's unmarked squad car and told Jesus Zambrano that he was not under arrest was false. It was also false that Jesus Zambrano agreed to speak with Patrick Schumacher. In fact Schumacher asked Sergeant Reed what to do with Zambrano and Sergeant Reed told Schumacher to put Zambrano in the backseat. Schumacher said to Zambrano to "jump in" and Zambrano jumped in. Schumacher did not  tell Zambrano that he was not under arrest and Zambrano did not agree to speak with Schumacher.

**Ex. J., 103:6-23, 104:1-24, 105:1-10**

26. Patrick Schumacher's statement in his police report that Jesus Zambrano told Schumacher that he was with Pedro Sanchez and Michael Ortiz the night before May 22, 2009 was false. In fact, Zambrano said only that he was at a female's house and had gone home.

**Ex. J., 106:24, 107:1-24, 115-14-24, 116:1-24, 117:1-6**

27. Patrick Schumacher's statement in his police report that Jesus Zambrano told Schumacher that the night before Jesus Zambrano went to Claudio Sanches's house in the area of Ruby Street near the west side of the Des Plaines river was false. Jesus Zambrano never gave Schumacher that information.

**Ex. J, 108:19-24, 109:1-24, 110:1-24, 11:1-19**

28. On May 22, Patrick Schumacher asked Jesus Zambrano where he was the might before.

**Ex. J., 106:15-23**

29. Patrick Schumacher was called as a witness by the defense in Jesus Zambrano's second  trial. He testified that although he initially had testified on cross-examination that Michael Ortiz was not arrested as part of his investigation, he had reviewed his police report over the weekend, his recollection had been refreshed, and he now remembered that Michael Ortiz had been arrested.

**Ex. F, pgs. 394-94**

30. In her opening closing argument in Jesus Zambrano's first trial, prosecutor McKenna referred to Patrick Schumacher's testimony as follows:

"That afternoon, the day  of May 22, 2009, Detective Schumacher goes to talk to the defendant. When he gets there, the defendant is still with Pedro Sanchez; but Detective Schumacher gets him away and talks to him alone. And the defendants doesn't say that Pedro Sanchez did anything or anything along those lines.

Mr. Bretz: Objection, Judge.

The Court: I will sustain the objection.

Mr. Bretz: I ask the jury to disregard.

Ms. McKenna: The defendant said that he was with Pedro the night before."

**Exhibit K, pg. 914**

31. In his closing argument, in Jesus Zambrano's first trial, defense counsel Bretz referred to Jesus Zambrano's conversation with  Patrick Schumacher as follows:

In attorney  Bretz's closing argument he referred to Patrick Schumacher's conversation with Jesus Zambrano on May 22 as follows:

"The third distinction between Jesus and Lopez is we know how Lopez lied and tried to direct

attention away from himself. As to Jesus, there was no evidence presented other than he was questioned about the evening of May 21, and I specifically asked the detective if he talked to him about being at Lois Place during the early morning hours of May 22, 2009, and he said, no, which leads us to the fourth and final distinction between then."

**Exhibit K, pg. 939**

32. In his rebuttal closing argument in Jesus Zambrano's first trial, prosecutor Walsh referred to Patrick Schumacher's testimony as follows:

Mr. Bretz talks a lot about Christian Lopez and his credibility as a witness. Well, think about this. The next day Jesus Zambrano talked to the police and doesn't tell them about the previous night.

Mr. Bretz: Objection, your Honor.

The Court: Sustain the objection.

Mr. Walsh: Jesus Zambrano talks to the police, mentions that he was with his friends and nothing else."

**Exhibit K, pg. 971**

33. During Jesus Zambrano's first trial, his mother, Norma Zambrano testified that on May 27, 2009 police came to her home and informed her that there was a murder warrant out for Jesus Zambrano. After she heard about the warrant, she left Joliet with her son, Jesus Zambrano. It was her idea to leave, and she did not give her son any choice in the matter. She told him to cut his hair and say that his name was Juan. She physically put him int the car. She did not testify that she told Jesus Zambrano about the warrant.

**Exhibit K, pgs 807-08, 812,**

34. During Jesus Zambrano's first trial, Christian Lopez was extensively cross-examined and impeached with his prior lies to the police,, his prior inconsistent statements, his poor memory

for events, his consumption of marijuana and alcohol, his prior felony convictions, and his pending cases, and his favorable treatment by the prosecution.

**Exhibit K, pgs 659-701, 705-09**

35. During Jesus Zambrano's first trial Elissa Hinton testified that she heard Pedro Sanchez's voice just before Robert Gooch was shot. Sanchez was a former boyfriend, had argued with Robert Gooch and had a motive to murder Robert Gooch, her current boyfriend. She did not know Jesus Zambrano and had no knowledge of any animosity between Jesus Zambrano and Robert Gooch.

**Exhibit K, pgs. 547-551, 554-555, 561-84**

Respectfully submitted,

/s/ Stephen L. Richards

 By: Stephen L. Richards Attorney for Plaintiff
53 West Jackson
Suite 756
Chicago, IL 60604
773-817-6927
sricha5461@aol.com Attorney No: 6191946

CERTIFICATION OF COUNSEL

The undersigned, Stephen L. Richards hereby certifies that the following document,

**PLAINITFF'S  LOCAL RULE 56.1 (b)(2)(3)  RESPONSE TO STATEMENT OF
MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND STATEMENT  OF ADDITIONAL MATERIAL
<u>FACTS</u>**

was served on August 14,  2023  in accordance with Fed. R. Civ. P. 5, LR 5.5, and the General
Order on Electronic Case Filing (ECF), pursuant to the district court's ECF system as to ECF
filers, and was sent by first-class mail or by hand delivery to non-ECF filers, if  any.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on, I electronically filed the foregoing paper with the Clerk of the Court using the ECF System which will send notification to all counsel of record via the Court's CM/ECF system on June 9, 2023.


/s/Andrew O'Donnell
Andrew O'Donnell

Attorney for City of Joliet and Patrick
Schumacher