UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JESUS ZAMBRANO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-4496 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF JOLIET, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

A state court jury found Jesus Zambrano guilty of first-degree murder. Half a decade later, after a successful appeal, Zambrano stood before the jury box a second time for the same murder. The second trial ended with an acquittal.

Zambrano, in turn, filed suit against one of the police officers who investigated the murder. He brought a claim under the Fourteenth Amendment, alleging fabrication of evidence. He also sued the City of Joliet as an indemnitor.

After discovery, Defendants moved for summary judgment. For the following reasons, the Court grants Defendants' motion.

### Non-Compliance with the Local Rules

The Court begins with the starting point for any motion for summary judgment: the Local Rules. The punchline is that Plaintiff Zambrano did not comply with the requirements for how to respond to a statement of material facts.

The Local Rules provide the rules of the road for motions for summary judgment, and responses. The Local Rules exist for good reason. Compliance with the Local Rules is essential, so that district courts can manage the flow of traffic on an overcrowded judicial highway. If

parties believe that they can go their own way, and play by their own set of rules, chaos would break out, and traffic would grind to a halt.

Local Rule 56.1 creates the ground rules for summary judgment. The rule imposes clear requirements for how the parties must present the facts. The moving party must file a statement of material facts, in concise numbered paragraphs. *See* L.R. 56.1(d)(1). The movant must support each fact with a citation to the evidentiary record. *See* L.R. 56.1(d)(2).

The non-movant has a duty to respond to each numbered paragraph. *See* L.R. 56.1(e). The non-movant must "admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." *See* L.R. 56.1(e)(2).

It is not good enough for the non-movant to say "disputed," and leave it at that. The Local Rules require the non-movant to point to evidence in the record, and explain what it means. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3). That way, a district court will see the evidence and hear an explanation.

Here, Zambrano offered half a loaf. Time and again, Zambrano responded to paragraphs in Defendants' statement of material facts by declaring that a fact was "DISPUTED," and then citing a bunch of lines from a deposition, without explanation. Here's a good example, among many others:

> 10.    While at the residence, Defendant Schumacher had a conversation with the Plaintiff. Plaintiff communicated to Schumacher that in the afternoon hours of May 21, 2009, he was with his friends, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. Ex. C, ¶ 9
>
> **DISPUTED  Ex. J., 106:24, 107:1-24, 115:14-24, 116:1-24, 117:1-6, 108:19-24, 109:1-24, 110:1-24, 111:1-19**

2

*See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 87) (bold in original); *see also id.*
at ¶¶ 11, 12, 14, 24, 26.

An explanation was nowhere to be found. Based on the filing, this Court has no idea why
Zambrano is disputing the fact in question. This Court couldn't figure it out without pulling out
the deposition transcript, reading the testimony for itself, and then spending the time to figure out
why the paragraph is inconsistent with the testimony.

In effect, Zambrano is attempting to reassign work that the Local Rules place on the
parties, and putting the work on the Court's plate. But the Local Rules place the burden on the
parties, for good reason. The parties know the record better than the Court. They're better
positioned to know what the issues are, and what evidence is important. And at the end of the
day, the parties are the ones who have their interests at stake.

Summary judgment is not a game of fetch, where the district court judge is required to
chase after the evidence thrown somewhere in the record by the parties. It is not the job of a
district judge to comb through the record and search for evidence that can support an
unsupported assertion by a party. Providing an explanation is the job of the parties. If the parties
don't give an explanation, then a lower court does not have to go on an expedition to hunt for
one.

Heaven helps those who help themselves, and the same can be said for litigants. Parties
who do not follow the rules should not expect extra help from the judiciary. Courts should not
have to go out of their way to help parties who do not comply with the rules.

The bottom line is simple. This Court will consider Zambrano's response to the
statement of material facts to the extent that it complies with the Local Rules. But this Court will
disregard any response that fails to "concisely explain how the cited material controverts the

asserted fact." *See* L.R. 56.1(e)(3). Any denial without an accompanying explanation is stricken, and the corresponding fact is deemed admitted (to the extent that it is properly supported, that is).

At the end of the day, as explained below, the outcome does not change. Even if this Court accepted the flat denials, there is no genuine issue of material fact.

## Background

### *The Murder*

The case is about a murder that took place in 2009, and the two trials that followed.

In the early morning hours of May 22, 2009, the Joliet Police Department received word of a minutes-old murder. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 5–6 (Dckt. No. 87); *People v. Zambrano*, 64 N.E.3d 639, 641 (Ill. App. Ct. 2016).

Someone shot and killed Robert Gooch at his girlfriend's apartment. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 87). Gooch's girlfriend, Elissa Hinton, lived in the Larkin Apartments complex. *Id.*

The parties do not connect all of the dots when introducing the characters in the story. But by the look of things, Hinton had recently broken up with a man named Pedro Sanchez. *See Zambrano*, 64 N.E.3d at 641.[1]

Hinton was home when Gooch was murdered. *Id.* She was asleep at the time, and the apartment buzzer startled her awake. *Id.* Gooch got out of bed to answer the door. *Id.*

---

[1] That romantic relationship isn't in the record, so it is not a fact, let alone a material fact. Even so, the Court includes the background for storytelling purposes only, to help the reader understand who's who. The same goes for any other citation to the *Zambrano* state-court decision in this opinion, including the next few paragraphs. It greases the wheels of storytelling.

Then Hinton heard Sanchez's voice: "It was my girl." *Id.* A shot rang out. *Id.* Hinton went into the living room and found Gooch lifeless on the floor. *Id.*

Before long, the Joliet Police Department put several officers on the case, including Detective Patrick Schumacher. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 4, 7 (Dckt. No. 87). On the afternoon of the murder, Detective Schumacher and five other officers went to the home of Plaintiff Jesus Zambrano to investigate. *Id.* at ¶ 8.

This Court does not know what initially brought Zambrano into the sights of the police. Maybe the detective was looking for Sanchez, and heard that he was at Zambrano's home. Or maybe there is some other explanation. Whatever the reason, the important thing is that the police went to Zambrano's residence.

Zambrano was home, with his mom. *Id.* at ¶ 9. Pedro Sanchez and another man, Michael Ortiz, were there too. *Id.*

Detective Schumacher and Zambrano talked. *Id.* at ¶ 10; *see also* Zambrano Dep., at 104:17-21 (Dckt. No. 79-1). Their conversation is the crux of this case.

According to Detective Schumacher, Zambrano gave some details about where he was, and who he was with, on the afternoon before the murder. The parties don't explain the significance of this piece of the evidentiary puzzle. The idea seems to be that Zambrano allegedly admitted to the officer that he was with Pedro Sanchez and Michael Ortiz on the afternoon before the murder. And he admitted that they were at a specific location.

As the detective later retold it, Zambrano said that "in the afternoon hours of May 21, 2009, he was with his friends, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River." *See* Pl.'s Resp. to

Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 87); *see also* Schumacher Dec., at ¶ 9 (Dckt. No. 79-3).

Zambrano admits that he was, in fact, at Claudia Sanchez's house with Pedro Sanchez and Michael Ortiz on May 21, meaning the day before the murder. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 38 (Dckt. No. 87). Zambrano admits that he was "drinking beer and smoking marijuana while at Claudia's residence." *Id.* at ¶ 39.

But according to Zambrano, he did not give those details to Detective Schumacher. That is, he didn't name names, and he didn't tell Detective Schumacher how to find Claudia Sanchez's house on a map. *Id.* at ¶ 23.

Instead, Zambrano says that he kept things vague during that 2009 interview. He simply told Detective Schumacher that he hung out "with [his] girl and a couple friends[.]" *See* Zambrano Dep., at 113:8-9 (Dckt. No. 79-1). (As an aside, at the time, Zambrano and Ms. Sanchez were dating. *Id.* at 113:14-18.)

So, by the sound of things, Zambrano *was* with Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence on the afternoon of May 21, meaning the afternoon before the murder. Everyone agrees that Zambrano was there. But the parties disagree about whether Zambrano shared those details with Detective Schumacher during the interview.

Zambrano apparently went to the police station for a follow-up interview with the officers later that day. But the contents of that interview are not material to the case at hand. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 12–14 (Dckt. No. 87).

Later that day (still May 22), Detective Schumacher interviewed Ms. Sanchez at her apartment. *Id.* at ¶ 15. Ms. Sanchez confirmed that Zambrano spent time at her apartment the

day before (May 21), along with Pedro Sanchez, Michael Ortiz, and someone else – Christian Lopez. *Id.* Ms. Sanchez's roommate gave the same account. *Id.* at ¶ 16.

Ms. Sanchez and her roommate also both positively identified Zambrano, Pedro Sanchez, Michael Ortiz, and Christian Lopez as the men who were at their residence when Detective Schumacher presented photo lineups. *Id.* at ¶¶ 15–16.

### *The Lopez Interview*

Detective Schumacher's long day on the job didn't end there. Christian Lopez voluntarily showed up at the police station. *See Zambrano*, 64 N.E.3d at 642.

Detective Schumacher interviewed Lopez at 10 p.m. that night (May 22). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 87). Lopez "confirmed" Zambrano's "involvement in the murder of Robert Gooch." *Id.*

Lopez told Detective Schumacher (and eventually the jury) the following story.

According to Lopez, he hung out with Zambrano, Sanchez, and Ortiz at Ms. Sanchez's home. *Id.* Lopez "confirmed that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana." *Id.*

Lopez shared that Zambrano drove the group (meaning Lopez, Pedro Sanchez, and Ortiz) to McDonald's. *Id.* at ¶ 18. And then the group drove to the Larkin Apartments. *Id.*

Once the group reached the apartment complex, Lopez saw Zambrano get a gun from the car's hood. *Id.* at ¶ 19. Lopez, Sanchez, and Zambrano went into the building. *Id.* Lopez stood at the bottom of the stairwell. *Id.* But Sanchez and Zambrano climbed up three floors. *Id.*

Lopez heard a gunshot. *Id.* Then he saw Zambrano and Sanchez run down the stairs to the car. *Id.*

Back outside, Lopez saw Zambrano put the gun back under the car's hood. *Id.* at ¶ 20. Zambrano drove everyone back to his house, where they spent the night. *Id.*; *see also Zambrano*, 64 N.E.3d at 642.

Lopez couldn't sleep. *See Zambrano*, 64 N.E.3d at 642. When the sun rose, he walked home. *Id.* Sometime later, he went to the police station. *Id.*

***The Police Report***

Detective Schumacher's long day of investigating bled into the early morning hours of May 23, 2009. He prepared a police report at 2:35 a.m. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 87); *see also* Schumacher Declaration, at ¶ 24 (Dckt. No. 79-3, at 3 of 11); Schumacher Report (Dckt. No. 79-3, at 6 of 11).

According to the police report, Zambrano admitted that he was with Pedro Sanchez and Michael Ortiz the day before the murder, and admitted the specific location:

> On 5/22/09 at approximately 1500 hrs I had the following conversation with Jesus Zambrano in essence and not verbatim. . . . Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. Zambrano stated to me that he was with his friends, PEDRO and MICHAEL. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother). Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who had lived somewhere in the area of Ruby St. near the Westside of the Desplaines River.

*See* Schumacher Report (Dckt. No. 79-3, at 6–7 of 11).

***The Arrest***

Three days later, the Joliet Police Department obtained a warrant for Zambrano's arrest. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 87). The Department relied on

the information that Lopez had revealed.  *Id.*  Detective Schumacher was not involved in obtaining Zambrano's arrest warrant.  *Id.* at ¶ 28.

On May 26, officers went to Zambrano's home to arrest him.  *Id.* at ¶ 31.  He wasn't home, but his mom was there.  *Id.*  Zambrano's mom told the officers that Zambrano "would turn himself in."  *Id.*

Zambrano never showed up at the police station.

Instead, officers received word that Zambrano, his mom, and his grandma had fled the residence in a red vehicle.  *Id.* at ¶ 32.  The Department entered the vehicle's information into a database, alerting officers across the United States to keep an eye out for the car.  *Id.*

Zambrano and his matriarchs turned up a long way from Illinois.

On May 28, a Texas state trooper spotted the vehicle.  *Id.* at ¶ 33.  The trooper pulled it over.  *Id.*  The male occupant told the trooper that he did not have identification, and that his name was "Juan."  *Id.* at ¶ 34.

As it turns out, Zambrano's fingerprint gave him away.  The trooper ran the man's fingerprints, and the trooper figured out that Juan was really Jesus Zambrano.  *Id.* at ¶ 35.  So, the trooper arrested Zambrano.  *Id.*

### The First Trial

The state charged Zambrano with first-degree murder.  *Id.* at ¶ 44.

During a pre-trial hearing, Zambrano's counsel seemed to acknowledge Zambrano's conversation with Detective Schumacher.  Counsel told the state court that Zambrano had made a brief statement "where he indicated that he was with his friends, Pedro and Michael. Zambrano then stated that they had gone to a girls house name[d] Claudia who lived somewhere around Ruby Street on the west side of the Des Plaines River."  *Id.* at ¶ 42 (cleaned up).

At trial, the state called seventeen witnesses to the stand. *Id.* at ¶ 45. Detective Schumacher testified. *Id.* So did Lopez, the state's star witness. *Id.*

Among other things, Detective Schumacher testified about the underlying facts in his police report. *Id.* at ¶ 50. He told the jury about his conversation with Zambrano on May 22. *Id.*

Specifically, Detective Schumacher testified that Zambrano had given him details about where he was, and who he was with. The testimony tracked the arrest report:

> Q:    And did you ask him any questions?
>
> A:    Yes, I asked him where he was the night prior.
>
> Q:    So, that would have been the evening of May 21, 2009?
>
> A:    Yes.
>
> Q:    Did he answer that question?
>
> A:    Yes.
>
> Q:    What did he tell you?
>
> A:    He stated that he was with Miguel Ortiz and Pedro Sanchez and that they had left from his residence and went to a female's residence who he names . . . who he knew as Claudia, who lived off Ruby Street near the west side of the Des Plaines River.

*Id.* The prosecutor "had no reason to believe that Detective Schumacher's police report" or "testimony was false." *Id.* at ¶ 51.

So Detective Schumacher testified about the substance of his interview with Zambrano on May 22. But the prosecution did *not* admit the police report into evidence. *Id.* at ¶ 52.

The jury considered more than just testimony. *Id.* at ¶ 47. The jury saw surveillance videos from McDonald's and the Larkin Apartments. *Id.*

The McDonald's video showed Zambrano pull through the drive thru between 12:36 a.m. and 12:40 a.m. on May 22. *See Zambrano*, 64 N.E.3d at 639.[2] In the case at hand (before this Court), Zambrano admits that he drove to McDonald's, and admits that he is the driver in the video. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 87).

An apartment complex surveillance video shows Zambrano's sedan pulling up not much later, at 12:47 a.m. *See Zambrano*, 64 N.E.3d at 641. An officer testified that the apartment complex was a 5-to-10-minute drive from the McDonald's. *Id.*

The video seems to have mirrored the story that Lopez told the jury. *Id.* at 641–42. The driver pulled up, got something from under the car's hood, and walked toward the building, alongside two of the passengers. *Id.* at 641.

The men returned to the car at 12:51 a.m. *Id.* The driver ran across the grass, put something back under the car's hood, and pulled away. *Id.*

During deliberations, the jury wanted to see some of the evidence in the jury room. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 63 (Dckt. No. 87). It asked for the surveillance videos and photographs. *Id.*

Then the jury announced its verdict: guilty. *Id.* at ¶ 66. Zambrano appealed. *Id.*

**The Appeal**

On appeal, Zambrano made two arguments. *Id.* He challenged his conviction on the ground that counsel failed to impeach Lopez with evidence that he received immunity to testify, and that the state court did not instruct the jury about accomplice liability. *Id.*

---

[2] Again, the appellate court decision isn't evidence. And the point isn't material, either. But it is interesting, and it does enliven the story. The Court relies on it simply for purposes of retelling the narrative.

The Appellate Court of Illinois sided with Zambrano. *Id.* at ¶ 68. It reversed the judgment and remanded, based on the missing jury instruction. *Id.* According to the appellate court, the missing instruction deprived the jury of "critical information it needed to evaluate Lopez's testimony." *Id.*; *see also Zambrano*, 64 N.E.3d at 647.

**The Second Trial**

The state tried again. And Zambrano got tried again.

Zambrano's second trial was déjà vu in many respects. For example, the state admitted the surveillance videos into evidence. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 75 (Dckt. No. 87). Lopez testified again. *Id.* at ¶ 71. Detective Schumacher did, too. *Id.*

Like the first time around, Detective Schumacher testified that Zambrano told him that on the night of the murder, he "was with several friends" – "Pedro Sanchez and Miguel Ortiz" – and that they had "gone to a girl's house named Claudia near the area off of Ruby Street, just west of the Des Plaines River." *Id.* at ¶ 72.

The second jury also asked to see some evidence during deliberations. *Id.* at ¶ 77. Among other things, it wanted to see the apartment surveillance videos and Lopez's trial transcript. *Id.*

Then the jury announced its verdict: not guilty. *Id.* at ¶ 70.

**The Federal Lawsuit**

With the first-degree murder charge behind him, Zambrano filed a lawsuit of his own. *See* Cplt. (Dckt. No. 3). The complaint contains two counts.

The first count is a due process claim under the Fourteenth Amendment against Detective Schumacher. *Id.* at ¶¶ 1, 119–22. The complaint alleges a "fabrication of a false statement allegedly made by" Zambrano. *Id.* at 11.

Specifically, Zambrano alleged that Detective Schumacher "authored a false police report, in which Schumacher claimed that . . . Zambrano admitted he was in the company of acting in concert with Michael Ortiz and Pedro Sanchez, the actual killer." *Id.* at ¶ 120. According to the complaint, Schumacher "conveyed this information to the prosecutors and testified to these false statements at trial." *Id.* at ¶ 121.

The second count is an indemnification claim against the City of Joliet. *Id.* at ¶¶ 123–25.

Defendants moved to dismiss the complaint for failure to state a claim. *See* Defs.' Mtn. to Dismiss (Dckt. No. 9). This Court granted the motion in part and denied it in part. *See* 8/11/22 Order (Dckt. No. 38).

This Court granted the motion to the extent that Zambrano's claim relied on testimony that Detective Schumacher gave at trial. Police officers testifying in criminal proceedings enjoy absolute immunity from section 1983 suits based on that testimony. *Id.* (citing *Briscoe v. LaHue*, 460 U.S. 325, 335–36, 345 (1983)).

This Court otherwise denied Defendants' motion to dismiss. *Id.* The Court explained that Zambrano's complaint seemed to take issue with more than Detective Schumacher's trial testimony. *Id.*

After discovery, Defendants moved for summary judgment. *See* Defs.' Mtn. for Summary Judgment (Dckt. No. 77). The Court turns to the motion.

## Legal Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. *See Jaranowski v. Indiana Harbor Belt Railroad Company*, 72 F.4th 744, 749 (7th Cir. 2023) (citation omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the burden to show that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive, the opposing party must identify specific facts showing a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

To decide the motion, this Court views the evidence and draws all reasonable inferences in Zambrano's favor as the non-moving party. *See Jaranowski*, 72 F.4th at 749. This Court does not weigh the evidence, or judge witness credibility, or determine the truth of the matter. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Instead, the Court determines whether a genuine issue of triable fact exists. *Id.*

In sum, summary judgment is only appropriate if – considering the evidence – no reasonable jury could return a verdict in Zambrano's favor. *See Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Fourteenth Amendment forbids states from depriving any person of liberty "without due process of law." *See* U.S. CONST. amend. XIV. Under recent case law, that guarantee of liberty includes protection from fabricated evidence. "Maybe there was a time when fabricated evidence did not give rise to a due process claim, but that's not the current state of the law." *See Hill v. Cook County*, 463 F. Supp. 3d 820, 835 (N.D. Ill. 2020).

"The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial

and thus depriving him of liberty without due process." *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020).

"An evidence-fabrication claim has four elements: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result." *See Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156 (N.D. Ill. 2022) (citing *Patrick*, 974 F.3d at 835).

Defendants argue that they are entitled to summary judgment for three reasons. First, Defendants argue that there is no evidence that Detective Schumacher deliberately falsified his report. Second, the report was not used against Zambrano at trial. Finally, Defendants argue that the report did not impact the first jury's guilty verdict. *See* Defs.' Mem., at 3–4 (Dckt. No. 78).

The Court will address the first two arguments (only). After the belt and the suspenders, there is no need to reach the third argument.

## I.      Intent to Falsify

Out of the gate, Defendants argue that there is no evidence about the intent of Detective Schumacher. The Court agrees. On this record, no reasonable jury could find that Detective Schumacher deliberately falsified his report.

A fabricated-evidence claim requires more than incorrect or inaccurate evidence. *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). The claim requires a showing of "knowingly falsified evidence." *Id.*

Proving that the police made a mistake is not enough – not by a long shot. Deliberately falsifying information means more than making a mistake. It is not an accident, an oversight, a blunder, a goof, or a gaffe. "Deliberately" falsifying information means serving up a lie, on purpose.

Indeed, the Seventh Circuit has described the intent standard as a "high bar to clear." *See Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019) (citation omitted); *see also Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (explaining that "[w]hat's relevant" is "whether the officers created evidence that *they knew to be false*") (cleaned up) (emphasis in original); *see also Black v. Montgomery County*, 835 F.3d 358, 372 (3d Cir. 2016) ("There must be pervasive evidence supporting a conclusion that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith.") (cleaned up).

Of course, intent is "most often proven circumstantially." *See Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017). An admission isn't necessary, and neither is a smoking gun. A defendant will rarely raise his hand and say, "I intended to do something wrong."

Still, a plaintiff cannot avoid summary judgment simply because intent is an element of the claim. "Summary judgment will not be defeated simply because issues of motive or intent are involved, and is proper when the plaintiff fails to indicate any motive or intent to support plaintiff's position." *See Morgan v. Harris Tr. & Sav. Bank of Chi.*, 867 F.2d 1023, 1026 (7th Cir. 1989); *see also Paulsen v. Olsen*, 2023 WL 8019393, at *9 (N.D. Ill. 2023). Issues about intent have no special fast-pass to a jury trial.

Against that backdrop, Zambrano has almost nothing to show when it comes to the officer's intent. In fact, Zambrano's entire argument about Detective Schumacher's intent boils down to one paragraph in his brief. *See* Pl.'s Resp., at 7 (Dckt. No. 86).

According to Zambrano, a jury could find that Detective Schumacher deliberately falsified the evidence because "Schumacher says that Zambrano told Schumacher his whereabouts; Jesus Zambrano says he did not. This is a classic example of a 'He Said/She Said' conflict which cannot be resolved on summary judgment." *Id.*

16

Zambrano misses the point. The accuracy of the report is important, but it is not the whole ballgame. Proving that the police report contained inaccurate information is necessary, but not sufficient. A mistake is different than a lie, and when it comes to a fabricated-evidence claim, the difference is everything.

The issue is *not* whether a reasonable jury could find that the police report contained inaccurate information. The issue is whether a reasonable jury could find that the officer prepared an inaccurate report deliberately.

Framing the issue as "He Said/She Said" overlooks the need for evidence about intent. The question is the intent of the officer, not the accuracy of the officer's report. *See Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 70 (3d Cir. 2017) ("If we were to hold that the 'he said, she said' dispute here rises to the level of fabricated evidence, we would undermine the 'unusual case' standard dictated by our precedent, which directs concern to cases in which there is actual evidence of fabrication.").

The record at hand includes no evidence that could support a finding by a reasonable jury that the officer deliberately falsified the police report. Without that evidence, Zambrano cannot get to trial on the fabricated-evidence claim.

## II. The Report's Non-Use at Trial

Zambrano's claim suffers from another fatal flaw. The prosecution did not use Detective Schumacher's report as evidence at Zambrano's trial. Zambrano wasn't "convicted and imprisoned based on knowingly falsified evidence," because the police report did not come into evidence. *See Patrick*, 974 F.3d at 835.

The fact that the report did not come into evidence dooms the Fourteenth Amendment claim. The reason stems from the nature of a claim under the Fourteenth Amendment.

Taking a step back, evidence-fabrication claims can sprout from the Fourth Amendment *or* the Fourteenth Amendment. *See Patrick*, 974 F.3d at 834–35. It depends on when and how the government uses the phony evidence.

"A claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause." *Id.* at 834; *see also Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) ("[T]he Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention.") (citation omitted). On the other hand, when "fabricated evidence is later *used at trial* to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial." *See Patrick*, 974 F.3d at 834 (emphasis added).

Different amendments apply to different stages of an interaction with law enforcement. If the police take you off the street based on phony evidence, that's a potential Fourth Amendment problem. If the state takes you to trial based on phony evidence, that's a potential Fourteenth Amendment problem.

To bring a Fourteenth Amendment claim, a plaintiff has the burden to prove that "the fabricated evidence was used against him *at his criminal trial*." *Id.* at 835 (emphasis added); *see also Jones v. York*, 34 F.4th 550, 562 (7th Cir. 2022) ("A police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way.") (cleaned up); *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017) ("[I]t was the *admission* of the false confession that made [the plaintiff's] trial unfair.") (emphasis added); *Brown*, 633 F. Supp. 3d at 1160 ("[The plaintiff's] evidence-fabrication claim regarding these reports fails because these reports were not used

against him at trial. Neither report was introduced at either of [the plaintiff's] trials, and neither report was used to refresh a witness's recollection during either trial.").[3]

After all, remember the constitutional foundation. A Fourteenth Amendment claim is about a denial of due process and a deprivation of "liberty" after a judgment of conviction. *See* U.S. CONST. amend. XIV.

Here, there is no dispute about what happened at the trial. Detective Schumacher's police report was not used at trial – the prosecution did not introduce it into evidence. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 87).

So, Zambrano's due process claim fails. *See Mack v. City of Chicago*, 2023 WL 4744791, at *14 (N.D. Ill. 2023) ("[The plaintiff's] fabrication claim as it applies to the police reports fares no better. None of the reports were introduced or used to refresh recollection during [the plaintiff's] criminal trial and therefore none were 'used' at a criminal trial.").

Zambrano argues that the police report was "used" at his criminal trial because there is a "strong likelihood" that the report was "used to convey to the prosecutors the substance of Schumacher's testimony" and that Schumacher reviewed "his testimony with prosecutors before testifying." *See* Pl.'s Resp., at 9 (Dckt. No. 86). Put differently, Zambrano's theory is that the prosecution and Detective Schumacher used the report when they prepared for trial. *Id.*

That argument fails in light of Seventh Circuit precedent about testimonial immunity. In *Jones v. York*, the plaintiff claimed that an officer falsely testified at trial about the officer's police report. *See Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022). The Seventh Circuit

---

[3] Some courts have concluded that a due process claim can survive when a plaintiff shows that the fabricated evidence was used "to coerce [him] to plead guilty." *See In re Watts Coordinated Pretrial Proceedings*, 2022 WL 9468206, at *7 (N.D. Ill. 2022); *Carter v. City of Chicago*, 2018 WL 1726421, at *5 (N.D. Ill. 2018). That issue is not before this Court.

explained that the officer was "absolutely immune from damages liability for his trial testimony." *Id.*

The immunity was not confined to in-court testimony. The Seventh Circuit confirmed that the officer's immunity covered his "*preparation* of testimony," too. *Id.* (cleaned up) (emphasis added).

Other courts have toed the same line, holding that immunity covers both testimony and the preparation for testimony. *See, e.g.*, *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (en banc) (concluding that the defendants did not have testifying-witness absolute immunity because the plaintiff's claims focused on the defendants' "actions while [the] murder was being investigated, not on their testimony at trial *or preparations to testify at trial*") (emphasis added); *Canen v. Chapman*, 847 F.3d 407, 415 (7th Cir. 2017) ("It is long-established that witnesses enjoy absolute immunity, and we have acknowledged that this protection covers the preparation of testimony as well as its actual delivery in court.") (cleaned up); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) ("Witnesses enjoy absolute immunity from civil liability on account of their testimony, and that immunity also covers preparation.") (citation omitted).[4]

In sum, Zambrano's claim fails because the police report did not provide the basis for his conviction. At trial, the police report did not see the light of day. The jury never saw the police report, so Zambrano wasn't convicted based on the police report. At best, maybe Detective Schumacher read the report to prepare for testimony, but the preparation for testimony cannot give rise to a claim. Without evidence that the conviction was based on the police report, Zambrano has no claim under the Fourteenth Amendment.

---

[4] True, "police officers who fabricate evidence cannot immunize themselves by authenticating it at trial." *See Jones*, 34 F.4th at 563. "In other words, police officers cannot purify fabricated evidence by invoking [the] absolute-immunity rule." *Id.* But here, Detective Schumacher did not "authenticate" the report at trial, because the report was not *introduced* at trial.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date:   February 9, 2024

_____

Steven C. Seeger
United States District Judge